UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | Case No. 1:18-cv-01219-RLY-DLP |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH, in his official capacity, *et al.*, | ) ) ) ) | |
| Defendants. | ) ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

CURTIS T. HILL, Jr.
Attorney General of Indiana

THOMAS M. FISHER
Solicitor General

JULIA C. PAYNE
Deputy Attorney General

Office of the Attorney General
IGC South, Fifth Floor
Indianapolis, Indiana 46204
Tel: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

*Counsel for Defendants*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION........................................................................... 1

BACKGROUND ............................................................................ 1

ARGUMENT ................................................................................. 4

    PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD
    OF SUCCESS ON THE MERITS.................................................. 4

I.    The Reporting Requirement Does Not Violate Substantive Due
    Process ............................................................................... 4

II.    The Reporting Requirement Does Not Violate Equal Protection..... 8

III.    The Reporting Requirement Is Not Unconstitutionally Vague...... 12

    A.  The list of abortion complications in the statute is
        exhaustive ...................................................................... 14

    B.  None of the specific complications listed in the statute are
        vague............................................................................. 16

        (4) Hemorrhaging.......................................................... 18

        (5) Blood clots .............................................................. 19

        (9) Missed ectopic pregnancy........................................ 20

        (13) Metabolic disorder ................................................. 21

        (14) Hypoglycemia occurring while the patient is being
            treated at the abortion facility ............................. 21

        (22) Physical injury associated with treatment performed
            at the abortion facility ....................................... 22

        (23) Adverse reaction to anesthesia or other drugs.................. 23

(24) Psychological or emotional complications, including depression, suicidal ideation, anxiety, and sleeping disorders ...........................................................................23

(26) Any other adverse event as defined by criteria provided in the Food and Drug Administration Safety Information and Adverse Event Reporting Program ........25

C.  The specific complications in the statute are severable from the Reporting Requirement .......................................................25

PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM ................................................................26

PUBLIC POLICY AND THE BALANCE OF EQUITIES FAVOR THE STATE ..............................................................27

CONCLUSION...................................................................28

CERTIFICATE OF SERVICE.............................................29

## TABLE OF AUTHORITIES

**C**ASES

*Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.,*
743 F.3d 569 (7th Cir. 2014) ................................................................ 5

*Adarand Constructors, Inc. v. Pena,*
515 U.S. 200 (1995) ............................................................................. 8

*Baja Contractors, Inc. v. City of Chicago,*
830 F.2d 667 (7th Cir. 1987) ................................................................ 4

*Bell's Gap R. Co. v. Pennsylvania,*
134 U.S. 232 (1890) ............................................................................. 8

*Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.,*
741 F.3d 769 (7th Cir. 2013) ................................................................ 5

*Columbus Bd. Of Educ. v. Penick,*
443 U.S. 449 (1979) ............................................................................. 9

*Dandridge v. Williams,*
397 U.S. 471 (1970) ........................................................................... 11

*Exxon Corp. v. Eagerton,*
462 U.S. 176 (1983) ........................................................................... 25

*Fargo Women's Health Org. v. Schafer,*
819 F. Supp. 865 (D.N.D. 1993) ......................................................... 27

*FCC v. Beach Communications, Inc.,*
508 U.S. 307 (1993) ........................................................................... 10

*Gonzales v. Carhart,*
550 U.S. 124 (2007) ...................................................................... 11, 23

*Harris v. McRae,*
448 U.S. 297 (1980) ........................................................................... 11

*Heller v. Doe,*
509 U.S. 312 (1993) ....................................................................... 9, 10

*Ill. Bell Tel. Co. v. WorldCom Tech., Inc.,*
157 F.3d 500 (7th Cir. 1998) .............................................................. 27

CASES [CONT'D]

*Ind. v. Keihn,*
  542 N.E.2d 963 (Ind. 1989) ............................................................ 13

*Ind. v. Kuebel,*
  172 N.E.2d 45 (Ind. 1961) ............................................................ 13

*Karlin v. Foust,*
  188 F.3d 446 (7th Cir. 1999) ........................................................ 12

*Lee v. City of Chi.,*
  330 F.3d 456 (7th Cir. 2003) .......................................................... 5

*Leigh v. Olson.*
  497 F. Supp. 1340 (D.N.D. 1980) ................................................... 7

*Planned Parenthood of Cent. Mo. v. Danforth,*
  428 U.S. 52 (1976) ........................................................................ 10

*Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health,*
  699 F.3d 962 (7th Cir. 2012) ....................................................... 10

*Planned Parenthood of Se. Pa. v. Casey,*
  686 F. Supp. 1089 (E.D. Penn. 1988) ............................................. 7

*Planned Parenthood of Se. Pa. v. Casey,*
  744 F. Supp. 1323 (E.D. Penn. 1990) ............................................. 7

*Planned Parenthood of Se. Pa. v. Casey,*
  505 U.S. 833 (1992) ......................................................................... 7

*Planned Parenthood of Wisc., Inc. v. Van Hollen,*
  738 F.3d 786 (7th Cir. 2013) .................................................. 11, 12

*Richardson v. National City Bank of Evansville,*
  141 F.3d 1228 (7th Cir. 1998) ..................................................... 15

*Roe v. Wade,*
  410 U.S. 113 (1973) ......................................................................... 5

*Simopoulos v. Virginia,*
  462 U.S. 506 (1983) ......................................................................... 5

*Sprunger v. Egli,*
  44 N.E.3d 690 (Ind. Ct. App. 2015) ............................................. 13

CASES [CONT'D]

*United States v. Rural Elec. Convenience Coop. Co.*,
    922 F.2d 429 (7th Cir. 1991) ................................................................ 27

*United States v. Sandidge*,
    863 F.3d 755 (7th Cir. 2017) ........................................................ 15, 16

*United States v. Siegel*,
    753 F.3d 705 (7th Cir. 2014) ................................................................ 16

*Vill. of Hoffman Estates v. Fliside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982) ...................................................................... 12, 13

*Walgreen Co. v. Sara Creek Prop. Co.*,
    966 F.2d 273 (7th Cir. 1992) ................................................................ 26

*Whole Woman's Health v. Hellerstedt*,
    136 S. Ct. 2292 (2016) .......................................................................... 1

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................ 26

CONSTITUTIONAL PROVISIONS

U.S. Const. amend. XIV, § 1 ...................................................................... 8

STATUTES

Ariz. Rev. Stat. Ann. § 36-2162 (eff. Dec. 31, 2018) ................................ 7

Ind. Code § 1-1-1-8(b)........................................................................ 25, 26

Ind. Code § 16-21-2-2.6 (eff. July 1, 2018) ............................................... 4

Ind. Code § 16-34-2-4.7 (eff. July 1, 2018) .......................................... 1, 2

Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018) ................................*passim*

Ind. Code § 16-34-2-4.7(a)(22) (eff. July 1, 2018)................................... 22

Ind. Code § 16-34-2-4.7(a)(26) (eff. July 1, 2018)................................... 15

Ind. Code § 16-34-2-4.7(b) (eff. July 1, 2018) ..................................... 2, 9

Ind. Code § 16-34-2-4.7(g) (eff. July 1, 2018) ..................................... 2, 6

Ind. Code § 16-34-2-4.7(h) (eff. July 1, 2018)......................................... 2

STATUTES [CONT'D]

Ind. Code § 16-34-2-4.7(j) (eff. July 1, 2018) ................................................. 2

Ind. Code § 31-33-5-1 .................................................................................... 13

Ind. Code § 35-50-3-3 .................................................................................... 13

Mich. Comp. Laws Ann. § 333.2837 ............................................................... 7

Minn. Stat. Ann. § 145.4132 .......................................................................... 7

Miss. Code Ann. § 41-41-77 ........................................................................... 7

N.D. Cent. Code § 14-02.1-07 ........................................................................ 7

Okla. Stat. Title 63, § 1-738(i)–(q) ................................................................. 7

18 Pa. Cons. Stat. § 3214(h). ......................................................................... 7

Tex. Health & Safety Code Ann. § 171.006 ................................................... 7

REGULATIONS

21 C.F.R. § 312.32 ........................................................................................ 25

OTHER AUTHORITIES

Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* (2012) ................................................. 13, 14, 15, 19

Merriam-Webster, *available at* https://www.merriam-webster.com/ dictionary/hemorrhage (last visited Jun. 1, 2018) ................................. 18

Oxford Dictionary, *available at* https://en.oxforddictionaries.com/ definition/treatment (last visited Jun. 1, 2018) .................................... 22

## INTRODUCTION

Indiana's Reporting Requirement requires doctors to report abortion complications that they observe and treat. *See* Ind. Code § 16-34-2-4.7 (eff. July 1, 2018). It adds nothing to Indiana's informed consent process, and imposes no new restrictions on a woman's access to abortion. It merely collects data so that scientists and scholars can better understand the relative safety of abortion as provided in Indiana. This Court should uphold Indiana's attempt to monitor the safety of abortion, and the preliminary injunction should be denied.

## BACKGROUND

In *Whole Woman's Health v. Hellerstedt*, the Supreme Court struck down Texas's admitting privileges and ambulatory surgical center requirements for abortion clinics, specifically noting that abortion is "safer than numerous procedures that take place outside hospitals" and that "childbirth is 14 times more likely than abortion to result in death." 136 S. Ct. 2292, 2315 (2016). But "studies show that 'a comparison of abortion mortality and maternal mortality is complicated by methodological problems,' including incomplete reporting, definitional incompatibilities, voluntary data collection, reliance on estimations, inaccurate/incomplete death certificates, and incompatibility with maternal mortality statistics." Christina Francis Decl. ¶ 7.

Neither the federal government nor most States mandate the collection of data on abortion complications. Without mandatory reporting requirements, the data regarding abortion complications is incomplete: some doctors will report only the

most serious complications, and many may choose not to report at all. *Id.* For this reason, scientists lack data regarding the types of complications that may follow abortion and the frequency with which they occur. *Id.* ¶ 9.

It is this problem that the Indiana legislature sought to address when it enacted Senate Enrolled Act No. 340 (SEA 340). Section 9 of SEA 340 (codified as Ind. Code § 16-34-2-4.7 (eff. July 1, 2018)) (the "Reporting Requirement") adds a section to the code requiring that physicians, hospitals, and abortion clinics "shall report to the [Indiana State Department of Health (ISDH)] each case in which the person treated a patient suffering from an abortion complication." *Id.* § 16-34-2-4.7(b) (eff. July 1, 2018). Failure to report an abortion complication is a Class B misdemeanor. *Id.* § 16-34-2-4.7(j).

Furthermore, each year, ISDH "shall compile a public report summarizing the information collected under this section," which "must include statistics for the previous calendar year, with updated information for the most recent calendar year." *Id.* § 16-34-2-4.7(g). It shall also "summarize the aggregate data . . . and submit the data . . . to the United States Centers for Disease Control and Prevention for its inclusion in the annual Vital Statistics Report." *Id.* § 16-34-2-4.7(h).

The term "abortion complication" is defined under the Reporting Requirement as "any adverse physical or psychological condition arising from the induction or performance of an abortion." *Id.* § 16-34-2-4.7(a). That definition is followed by an exhaustive list of complications covered:

    (1) Uterine perforation.
    (2) Cervical perforation.

2

(3) Infection.
(4) Hemorrhaging.
(5) Blood clots.
(6) Failure to terminate the pregnancy.
(7) Incomplete abortion (retained tissue).
(8) Pelvic inflammatory disease.
(9) Missed ectopic pregnancy.
(10) Cardiac arrest.
(11) Respiratory arrest.
(12) Renal failure.
(13) Metabolic disorder.
(14) Shock.
(15) Embolism.
(16) Coma.
(17) Placenta previa in subsequent pregnancies.
(18) Pre-term delivery in subsequent pregnancies.
(19) Free fluid in the abdomen.
(20) Hemolytic reaction due to the administration of ABO-incompatible blood or blood products.
(21) Hypoglycemia occurring while the patient is being treated at the abortion facility.
(22) Physical injury associated with treatment performed at the abortion facility.
(23) Adverse reaction to anesthesia or other drugs.
(24) Psychological or emotional complications, including depression, suicidal ideation, anxiety, and sleeping disorders.
(25) Death.
(26) Any other adverse event as defined by criteria provided in the Food and Drug Administration Safety Information and Adverse Event Reporting Program.

*Id.* All complications listed are complications of an abortion. Francis Decl. ¶ 12.

On April 23, 2018, Planned Parenthood brought suit against ISDH, the prosecutors of Marion, Lake, Monroe, and Tippecanoe Counties, and the individual members of the Medical Licensing Board of Indiana, alleging that the Reporting Requirement violates the Due Process and the Equal Protection Clauses of the U.S. Constitution. ECF No. 1, Compl. ¶ 47–48. And on May 7, 2018, Planned Parenthood

moved for a preliminary injunction against the Reporting Requirement.  ECF No. 11, Mot. Prelim. Inj.[1]

## ARGUMENT

In order to determine whether a preliminary injunction should be granted, the Court weighs several factors:

> (1) whether the plaintiff has demonstrated at least a reasonable likelihood of prevailing on the merits;
>
> (2) whether the plaintiff has no adequate remedy at law, thus causing irreparable harm;
>
> (3) whether plaintiff's threatened injury outweighs the threatened harm the grant of the injunction will inflict on the defendant; and
>
> (4) whether granting the preliminary injunction would harm the public interest.

*See, e.g.*, *Baja Contractors, Inc. v. City of Chicago*, 830 F.2d 667, 675 (7th Cir. 1987). PPINK fails to demonstrate a likelihood of success on the merits of each claim and cannot satisfy the remaining factors.

## PLAINTIFF CANNOT DEMONSTRATE A LIKELIHOOD OF SUCCESS ON THE MERITS

### I.   The Reporting Requirement Does Not Violate Substantive Due Process

Planned Parenthood does not allege that a fundamental right is at stake here. *See* ECF No. 16, Pl.'s Mem. Supp. Mot. Prelim. Inj. 27–29 (applying rational basis test).   Planned Parenthood instead relies on the "residual substantive limit on

---

[1] Planned Parenthood's complaint and motion for preliminary injunction also challenged Indiana Code section 16-21-2-2.6 (eff. July 1, 2018), which requires the annual inspection of abortion clinics.  ECF No. 1, Compl. ¶ 46; ECF No. 11, Mot. Prelim. Inj. 2.  But Planned Parenthood withdrew this portion of its preliminary injunction in its memorandum.  ECF No. 16, Pl.'s Mem. Supp. Mot. Prelim. Inj. 2 n.1.

government action which prohibits arbitrary deprivations of liberty by government." *Hayden ex rel. A.H. v. Greensburg Cmty. Sch. Corp.*, 743 F.3d 569, 576 (7th Cir. 2014). Therefore, rational-basis review applies. "'Unless a governmental practice encroaches on a fundamental right, substantive due process requires only that the practice be rationally related to a legitimate government interest, or alternatively phrased, that the practice be neither arbitrary nor irrational.'" *Charleston v. Bd. of Trustees of Univ. of Ill. at Chi.*, 741 F.3d 769, 774 (7th Cir. 2013) (quoting *Lee v. City of Chi.*, 330 F.3d 456, 467 (7th Cir. 2003)). The Reporting Requirement passes this test.

The Supreme Court has repeatedly recognized that the State has a "compelling interest in 'protecting the woman's own health and safety.'" *Simopoulos v. Virginia*, 462 U.S. 506, 519 (1983) (quoting *Roe v. Wade*, 410 U.S. 113, 150 (1973)). Planned Parenthood does not contest that "there may be reason to report serious and unexpected events so that they will not recur and, if necessary, to target practitioners who are engaging in problematic behavior." ECF No. 16, Pl.'s Mem 27. Instead, it argues that the Reporting Requirement is not rationally related to that purpose because it "require[s] the reporting of normal effects associated with abortions or minor complications that are anticipated and are routinely dealt with." *Id.* at 29.

But the Reporting Requirement demands only reports of "any *adverse* physical or psychological condition arising from the induction or performance of an abortion." Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018). The normal bleeding and clotting that happens during a medication abortion is neither a complication nor a side effect. It

is, rather, *the abortion itself*. Francis Decl. ¶ 15. As Dr. Francis acknowledges in her declaration, every woman who has a medication abortion will bleed, and every woman who bleeds will clot. *Id*. But beyond the normal bleeding and clotting that constitute the abortion, a woman who consents to an abortion has a strong interest in knowing *all* possible outcomes of the abortion, including both serious complications, no matter how rare, *and* normal side effects, no matter how minor.

The Reporting Requirement furthers that interest by providing comprehensive data on the rate of complications for abortion as performed in Indiana. "[A]bortion complications are notoriously difficult to track" because "women often are not treated for abortion complications by the same doctor that performed the abortion." *Id*. ¶ 8. Without a reporting requirement, complications and side effects may never be traced back to the abortion. Indeed, some doctors may report only the most serious complications or may choose not to report at all. *Id*. The Department will then compile an annual public report that summarizes the types of complications and the rates at which those complications occur. Ind. Code § 16-34-2-4.7(g). Scholars and scientists will be able to draw on that data to better assess the overall safety of abortion, and as a result, women will be able to make a more informed abortion decision.

There is no chance that the Reporting Requirement will "erect[] a barrier of misinformation that will face women seeking abortions." *See* ECF No. 16, Pl.'s Mem 28. The reports themselves will be factually accurate because the doctors treating the complications will be reporting the problems that they observe. If the scientists

6

and scholars who analyze the data believe that over-reporting has decreased its utility, then they will be free to publish articles and studies refuting the data. Indeed, this is the purpose of the scientific method. Francis Decl. ¶ 10. But the *mere existence* of the data cannot possibly be a barrier to abortion.

Eight other States require the reporting of abortion complications. *See* Ariz. Rev. Stat. Ann. § 36-2162 (eff. Dec. 31, 2018); Mich. Comp. Laws Ann. § 333.2837; Minn. Stat. Ann. § 145.4132; Miss. Code Ann. § 41-41-77; N.D. Cent. Code § 14-02.1-07; Okla. Stat. tit. 63, § 1-738(i)–(q); 18 Pa. Cons. Stat. § 3214(h); Tex. Health & Safety Code Ann. § 171.006. Of these, only two have been challenged: North Dakota's and Pennsylvania's. The North Dakota statute was upheld on vagueness grounds in *Leigh v. Olson*. 497 F. Supp. 1340, 1350–51 (D.N.D. 1980).

Even more on point, the Pennsylvania statute was challenged at the district court level by the plaintiffs in *Planned Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992). The district court upheld the statute both at preliminary injunction and summary judgment, specifically rejecting the plaintiff's arguments that the reports would "yield scientifically inaccurate data." *Planned Parenthood of Se. Pa. v. Casey*, 686 F. Supp. 1089, 1131 (E.D. Penn. 1988) ("It is not for this court to criticize the Commonwealth's failure to implement a perfect system for collection of data."); *Planned Parenthood of Se. Pa. v. Casey*, 744 F. Supp. 1323, 1393 (E.D. Penn. 1990) ("While the data gathered by these reports may not perfectly reflect all medical complications, I am not persuaded that the information is statistically meaningless. Because sections 3214(a)(7) and 3214(h) are reasonably related to the

Commonwealth's interest in protecting maternal health, I reject plaintiffs' challenge to these reporting requirements.").  The plaintiffs did not challenge this part of the decision on appeal.

Because the Reporting Requirement is rationally related to the legitimate state interest in ensuring the safety of abortion, it does not violate substantive due process.

## II.  The Reporting Requirement Does Not Violate Equal Protection

Planned Parenthood also claims that the Reporting Requirement violates the Equal Protection Clause of the Fourteenth Amendment "by imposing on persons different reporting requirements based on whether the 'complication' arises after an abortion or other medical procedure."  ECF No. 16, Pl.'s Mem. 31.  Because no suspect class is at issue here, Planned Parenthood concedes that rational basis review again applies.  *See id.* at 30.

1.  Planned Parenthood argues that the Reporting Requirement violates Equal Protection because it distinguishes between abortion and other medical procedures.  *See id.* at 31.  But the Equal Protection Clause protects persons, not procedures.  *See* U.S. Const. amend. XIV, § 1 ("[N]or shall any State deprive any *person* of life, liberty, or property, without due process of law; nor deny to any *person* within its jurisdiction the equal protection of the laws" (emphasis added)); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 230 (1995) (noting the "long line of cases understanding equal protection as a personal right"); *Bell's Gap R. Co. v. Pennsylvania*, 134 U.S. 232, 237 (1890) ("The [Equal Protection Clause] was not intended to prevent a state from adjusting its system of taxation . . . [by] exempt[ing]

certain classes of property from any taxation at all . . . . But clear and hostile discriminations against particular persons and classes . . . might be obnoxious to the constitutional prohibition.").

Planned Parenthood tries to circumvent this problem by arguing that "certain *persons* will have to file reports as to 'complications' while *others*, whose patients have identical or much more severe results after surgery of other medical events, will not." ECF No. 16, Pl.'s Mem. 29 (emphasis added).   But nothing in the Reporting Requirement distinguishes between physicians or providers who perform abortions and those who do not.   *See* Ind. Code § 16-34-2-4.7(b) (applying the Reporting Requirement to all licensed physicians, hospitals, and abortion clinics).   Really, Planned Parenthood is making a disparate impact argument: abortion doctors and clinics are more likely to treat patients for the complications of abortion and therefore are more likely to fall within the Reporting Requirement.   But such a disparate impact does not constitute disparate treatment.   *See Columbus Bd. Of Educ. v. Penick*, 443 U.S. 449, 464 (1979) ("[D]isparate impact and foreseeable consequences, without more, do not establish a constitutional violation.").   Therefore, Planned Parenthood has not even alleged a cognizable Equal Protection claim.

2.     Regardless, the statute's distinction between abortion and other medical procedures is legitimate.   Any legislative classification that does not involve a suspect class "is accorded a strong presumption of validity."   *Heller v. Doe*, 509 U.S. 312, 319 (1993).   For these classifications, the challenger must show that there is no "rational relationship between the disparity of treatment and some legitimate governmental

purpose." *Id.* at 320. Manifestly, "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Id.* at 319 (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313 (1993)). The classification "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* at 320 (quoting *Beach Communications*, 508 U.S. at 313).

The Supreme Court and Seventh Circuit have repeatedly confirmed the legitimacy of regulating abortion differently from other medical procedures. *Planned Parenthood of Cent. Mo. v. Danforth*, 428 U.S. 52, 80–81 (1976) (recognizing that abortion providers can be treated different from those providing "other, and comparable, medical or surgical procedures."); *Planned Parenthood of Ind., Inc. v. Comm'r of Ind. State Dep't of Health*, 699 F.3d 962, 988 (7th Cir. 2012) ("[T]he government need not be neutral between abortion providers and other medical providers . . . . [T]he government is free to treat abortion providers differently."). Here, it is rational to distinguish between abortion and other medical procedures because the complications of abortion are more difficult to track. As Dr. Francis explains in her declaration, women who suffer complications from abortion are not always treated for those complications by the same doctor who performed the abortion, especially if those complications arise years later in connection with a subsequent pregnancy. Francis Decl. ¶ 8. Non-mandatory reporting leads to incomplete data regarding abortion complications because some doctors may only report the most serious violations or may choose not to report at all. *Id.*

10

More fundamentally, "[a]bortion is inherently different from other medical procedures, because no other procedure involves the purposeful termination of a potential life." *Harris v. McRae*, 448 U.S. 297, 325 (1980).  While the Reporting Requirement does not directly protect fetal life, it aims to collect data that will better inform a woman's choice whether or not to end that life.  It is crucial that a woman knows the possible complications of the abortion procedure, particularly the psychological and emotional complications, when she makes this decision.  After all, "it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained." *Gonzales v. Carhart*, 550 U.S. 124, 159 (2007).

Planned Parenthood argues that "it is utterly irrational to ignore non-abortion procedures that are much more likely to injure the public health than abortions" and suggests "requir[ing] the reporting of information on 'pregnancy complications'" as well.  ECF No. 16, Pl.'s Mem. 31 & n.16.  "But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all." *Dandridge v. Williams*, 397 U.S. 471, 486–87 (1970). The legislature could have rationally concluded that because data on abortion complications is so sparse, it is an appropriate subject for increased reporting.

Planned Parenthood points to dicta in *Planned Parenthood of Wisc., Inc. v. Van Hollen*, 738 F.3d 786, 790 (7th Cir. 2013) (invalidating Wisconsin admitting privileges requirement on undue burden grounds), to support its Equal Protection argument. *See* ECF No. 16, Pl.'s Mem. 32.  But the Court in *Van Hollen* relied on Wisconsin's

lack of evidence regarding the occurrence of abortion complications to invalidate a statute that imposed an undue burden on a woman's right to an abortion.  783 F.3d at 790.  This is exactly the type of data the State seeks to collect here, and no undue burden has been alleged by the mere collection of that data.

Finally, Planned Parenthood argues that the Reporting Requirement is irrational because up to this point, "Indiana has seen fit to impose the identical requirements concerning the reporting of extremely serious consequences on hospitals, ambulatory surgical centers and abortion clinics."  ECF No. 16, Pl.'s Mem. 32.  But the legislature is not frozen in time simply because it chooses now to enact different requirements than it had in the past.  The rational basis test does not require such exacting scrutiny.

For these reasons, the Reporting Requirement does not violate the Equal Protection Clause.

## III.   The Reporting Requirement Is Not Unconstitutionally Vague

A statute is unconstitutionally vague if "it fails to provide 'fair warning' as to what conduct will subject a person to liability" or it fails to "contain an explicit and ascertainable standard" in order to prevent "arbitrary and discriminatory" enforcement. *Karlin v. Foust*, 188 F.3d 446, 458–59 (7th Cir. 1999).  However, a court should not mechanically apply these principles because "[t]he degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Vill. of Hoffman*

*Estates v. Fliside, Hoffman Estates, Inc.,* 455 U.S. 489, 498 (1982).  A statute is facially invalid only if it is impermissibly vague in all of its applications.  *Id.* at 497.

Planned Parenthood begins its vagueness argument by pointing out that the Reporting Requirement does not include a *mens rea* requirement.  ECF No. 16, Pl.'s Mem. 22.  First, lack of *mens rea* is not a constitutional defect.  *See Ind. v. Kuebel*, 172 N.E.2d 45, 48 (Ind. 1961).  Second, under Indiana law, there is a presumption that criminal statutes require proof of *mens rea. See Ind. v. Keihn*, 542 N.E.2d 963, 967 (Ind. 1989); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 303–12 (2012). And while there may be uncertainty as to what *mens rea* prosecutors will be required to prove with this statute, the most analogous reporting statute—which will be a key indicator for Indiana courts when they apply this statute, *see Keihn*, 542 N.E.2d at 967—imposes a duty to report child abuse and neglect if an individual "has reason to believe that a child is a victim." Ind. Code § 31-33-5-1; *see also Sprunger v. Egli*, 44 N.E.3d 690, 693 (Ind. Ct. App. 2015) ("'Reason to believe,' for the purpose of the reporting statutes, 'means evidence that, if presented to individuals of similar background and training, would cause the individuals to believe that a child was abused or neglected.'").  Applying the same standard here, a doctor would be required to report a complication if the doctor has reason to believe that it may have resulted from an abortion.  Moreover, a violation of the Reporting Requirement is a Class B misdemeanor, which is punishable by up to one hundred eighty days in jail.  Ind. Code § 35-50-3-3.  Such a severe punishment,

rather than just a fine, suggests that a higher *mens rea*, such as knowledge, will be required.

Next, Planned Parenthood contends that the definition of "abortion complication" is "hopelessly vague." ECF No. 16, Pl.'s Mem. 23. But the challenged statute provides an exhaustive list of specific abortion complications that are required to be reported. None of these complications are vague, but even if some are, they are severable from the remainder of Reporting Requirement. Therefore, the Reporting Requirement is not unconstitutionally vague in violation of the Due Process Clause of the Fourteenth Amendment.

## A.     The list of abortion complications in the statute is exhaustive

The Reporting Requirement generally defines "abortion complication" to mean "any adverse physical or psychological condition arising from the induction or performance of an abortion." Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018). Planned Parenthood argues that this definition is "hopelessly vague" and "without any limitation whatsoever." ECF No. 16, Pl.'s Mem. 23. Not so. The general definition of "abortion complication" is followed by an exhaustive list of twenty-six specific and concrete complications that should be reported. *See* Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018).

Planned Parenthood argues that list is illustrative only, not exhaustive. *See* ECF No. 16, Pl.'s Mem. 26. But such an interpretation ignores a well-known canon of statutory interpretation: *expressio unius est exclusio alterius*, or the expression of one thing implies the exclusion of others. *See* Antonin Scalia & Bryan A. Garner,

14

*Reading Law: The Interpretation of Legal Texts* 107–11 (2012).  The specificity of the list along with the sheer number of examples supports the interpretation that the list is exhaustive.  "The more specific the enumeration, the greater the force of the canon." *Id.* at 108.   Planned Parenthood, citing *Richardson v. National City Bank of Evansville*, 141 F.3d 1228, 1232 (7th Cir. 1998), argues that the word "includes" suggests that the items on the list are merely examples of complications, rather than an exhaustive list.   ECF No. 16, Pl.'s Mem. 26.   The language of the statute interpreted in *Richardson*, however, was much more general.  It began with a general definition of "interest," followed by a list of what interest "includes, *among other things*," and another list of what interest "does not *ordinarily* include."  *Richardson*, 141 F.3d at 1230 (emphasis added).  Looking at this language, the court determined that the final list, what interest does not ordinarily include, was illustrative rather than exhaustive.  *Id.* at 1232.  Here, in contrast, the word "includes" is followed by a list of twenty-six different complications, including a catch-all provision with limits defined by federal law.  *See* Ind. Code § 16-34-2-4.7(a)(26).   No reasonable person would conclude, after looking at this list, that the statute might encompass still more unknown complications.

The other cases cited by Planned Parenthood do not challenge this interpretation.  *See* ECF No. 16, Pl.'s Mem. 25.  In *United States v. Sandidge*, the Seventh Circuit held that a condition of supervised release "prohibiting the 'excessive use of alcohol,' defined as including 'any use of alcohol that adversely affects [the] defendant's employment, relationships, or ability to comply with the conditions of

supervision,'" was unconstitutionally vague.   863 F.3d 755, 757 (7th Cir. 2017) (alteration in original).  But the condition had no list further explaining the meaning of "adversely affects."   Similarly, in *United States v. Siegel*, the Court invalidated a condition of supervised release prohibiting the "excessive use of alcohol."   753 F.3d 705, 707 (7th Cir. 2014).  The "adversely affects" language that Planned Parenthood points to was not even in the express condition, but found in a brochure outside the record.  *Id.* at 715.  These holdings are not helpful here.

### B.   None of the specific complications listed in the statute are vague

Next, Planned Parenthood argues that "the breadth of the examples themselves renders them just as meaningless as the statutory definition."   ECF No. 16, Pl.'s Mem. 26.   Of the twenty-six complications listed in the statute, Planned Parenthood admits that seven are reasonably-ascertainable complications of abortion: (1) uterine perforation, ECF No. 16-2, John William Stutsman Decl. ¶ 27; ECF No. 16-3, Carol Dellinger Decl. ¶ 7; ECF No. 16-5, Sabrina Holmquist Decl. ¶ 26; (2) cervical perforation, ECF No. 16-2, Stutsman Decl. ¶ 27; ECF No. 16-5, Holmquist Decl. ¶ 26; (3) infection, ECF No. 16-2, Stutsman Decl. ¶ 27; ECF No. 16-3, Dellinger Decl. ¶ 7; ECF No. 16-5, Holmquist Decl. ¶ 26; (6) failure to terminate pregnancy, ECF No. 16-5, Holmquist Decl. ¶ 51; (7) incomplete abortion (retained tissue), *id.*; (8) pelvic inflammatory disease, *id.* ¶ 49 (explaining that pelvic inflammatory disease "could result from an untreated post-abortal infection"); and (19) free fluid in the abdomen, *id.* ¶ 53 (explaining that "free fluid in the abdomen"

could result from "bleeding into the abdomen caused by a uterine perforation"). Accordingly, there is no basis for the Court to enjoin reporting of these seven.

For ten more of the listed complications, Planned Parenthood does not contend that it does not know how to identify them, but simply that they are not complications of abortion at all.  If true, this only means that Planned Parenthood will never need to report these complications, but it has no bearing on their vagueness.   These complications include: (10) cardiac arrest, ECF No. 16-2, Stutsman Decl. ¶ 34; ECF No. 16-3, Dellinger Decl. ¶ 26; ECF No. 16-5, Holmquist Decl. ¶ 46; (11) respiratory arrest, ECF No. 16-2, Stutsman Decl. ¶ 34; ECF No. 16-3, Dellinger Decl. ¶ 26; ECF No. 16-5, Holmquist Decl. ¶ 46; (12) renal failure, ECF No. 16-2, Stutsman Decl. ¶ 34; ECF No. 16-3, Dellinger Decl. ¶ 26; ECF No. 16-5, Holmquist Decl. ¶ 46; (14) shock, ECF No. 16-2, Stutsman Decl. ¶ 34; ECF No. 16-3, Dellinger Decl. ¶ 26; ECF No. 16-5, Holmquist Decl. ¶ 46; (15) embolism, ECF No. 16-5, Holmquist Decl. ¶ 46; (16) coma, ECF No. 16-2, Stutsman Decl. ¶ 34; ECF No. 16-3, Dellinger Decl. ¶ 26; ECF No. 16-5, Holmquist Decl. ¶ 46; (17) placenta previa in subsequent pregnancies, ECF No. 16-2, Stutsman Decl. ¶ 37; ECF No. 16-5, Holmquist Decl. ¶ 43; (18) pre-term delivery in subsequent pregnancies, ECF No. 16-2, Stutsman Decl. ¶ 37; ECF No. 16-5, Holmquist Decl. ¶ 44; (20) hemolytic reaction due to the administration of ABO-incompatible blood or blood products, ECF No. 16-2, Stutsman Decl. ¶ 36; ECF No. 16-3, Dellinger Decl. ¶ 27; ECF No. 16-5, Holmquist Decl. ¶ 46; and (25) death, ECF No. 16-1, Christie Gillespie Decl. ¶ 29; ECF No. 16-2, Stutsman Decl. ¶ 9; ECF No.

16-5, Holmquist Decl. ¶ 46.  Again, there are no grounds for enjoining the Reporting Requirement as to any of these complications.

In sum, Planned Parenthood mounts colorable vagueness challenges to only nine of the twenty-six complications listed in the statute: (4) hemorrhaging, (5) blood clots, (9) missed ectopic pregnancy, (13) metabolic disorder, (21) hypoglycemia occurring while the patient is being treated at the abortion facility; (22) physical injury associated with treatment performed at the abortion facility, (23) adverse reaction to anesthesia or other drugs, (24) psychological or emotional complications, including depression suicidal ideation, anxiety, and sleeping disorders, and (26) any other adverse event as defined by criteria provided in the Food and Drug Administration Safety Information and Adverse Event Reporting Program.  These complications will be addressed in turn.

### (4) Hemorrhaging

Planned Parenthood admits that hemorrhaging has a specific medical meaning: "a significant loss of blood, generally over 500 cc in obstetrics and abortion practice."  ECF No. 16-5, Holmquist Decl. ¶ 50; *see also* ECF No. 16, Pl.'s Mem. 24 n.13; ECF No. 16-1, Gillespie Decl. ¶ 30; ECF No. 16-3, Dellinger Decl. ¶ 25; ECF No. 16-2, Stutsman Decl. 189.  Similarly, Merriam-Webster defines "hemorrhage" as a medical term which means "a *copious* or *heavy* discharge of blood from the blood vessels."   Merriam-Webster, *available at* https://www.merriam-webster.com/dictionary/hemorrhage (last visited Jun. 1, 2018) (emphasis added).  For purposes of statutory interpretation, "[w]ords are to be understood in their ordinary, everyday

meanings—unless the context indicates that they bear a technical sense." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 69 (2012). Here, the context—a list of possible complications for a medical procedure—suggests that "hemorrhaging" should be given its ordinary *medical* meaning. "'Hemorrhaging' is usually understood by medical professionals to mean serious bleeding that requires urgent medical attention." Francis Decl. ¶ 15.

Applying the ordinary medical meaning of "hemorrhaging," no reasonable physician would understand the term to include "the type of bleeding that is the ordinary and expected result of a surgical abortion." ECF No. 16, Pl.'s Mem. 24. "Physicians are frequently required to make the call of whether bleeding constitutes hemorrhaging after deliveries, natural miscarriages, and abnormal periods." Francis Decl. ¶ 15. The context of the statute, which requires the reporting of *complications* of abortion, lends support to this interpretation. Therefore, it is reasonable to infer that minor bleeding that is either the abortion itself or a normal side effect of surgical or medication abortion is not "hemorrhaging" and does not fall within the Reporting Requirement.

**(5) Blood clots**

Similarly, the term "blood clots" should be interpreted in light of the statute's requirement to report abortion "complications," not normal side effects. Dr. Dellinger stated in her declaration that "as a doctor I view 'blood clots' to refer to deep vein thrombosis and other serious similar events." ECF No. 16-3, Decl. of Carol Dellinger ¶ 25. Because "[e]very woman who has a medication abortion will bleed, and many

19

of these women will pass clots," Francis Decl. ¶ 15, it would be unreasonable to interpret "blood clots" to include the type of clots normally expelled by a woman's body during or after an abortion.  *See* ECF No. 16-2, Stutsman Decl. ¶ 40; ECF No. 16-3, Dellinger Decl. ¶ 25.  Thus, this provision can reasonably be understood only to refer to those blood clots that are a *complication* of abortion, specifically deep-vein thrombosis and pulmonary embolisms, both which can have life-threatening consequences.  Francis Decl. ¶ 16.

**(9) Missed ectopic pregnancy**

Planned Parenthood does not argue that it does not know how to identify an ectopic pregnancy.  *See* ECF No. 16-2, Stutsman Decl. 189 (defining "ectopic pregnancy" as "[a]n abnormal pregnancy that occurs when a fertilized egg grows outside the uterus, most commonly in a fallopian tube").  On the contrary, Planned Parenthood argues that it is so adept at identifying ectopic pregnancies during the pre-abortion ultrasound required by Indiana law that a *missed* ectopic pregnancy could never occur.  *See* ECF No. 16-5, Holmquist Decl. ¶ 39.  If true, Planned Parenthood need not fret over the meaning of "missed ectopic pregnancy" because it will never need to report one.

But the entire concept of a *missed* ectopic pregnancy assumes that the physician failed to identify it during the pre-abortion ultrasound and does not discover it until the abortion procedure has already begun.  At that point, the standard of care would be to wake the patient up to obtain their informed consent to perform surgery for the removal of the ectopic pregnancy.  Francis Decl. ¶ 18.

20

Because an ectopic pregnancy is a life-threatening condition, failure to report such an event would be a material omission on the part of the doctor. *Id.*

**(13) Metabolic disorder**

A metabolic disorder "generally refers to the disruption of the metabolism." ECF No. 16-3, Dellinger Decl. ¶ 29. Once again, Planned Parenthood does not argue that it cannot identify a metabolic disorder, but that such disorders do not arise as a result of abortion. *See* ECF No. 16-2, Stutsman Decl. ¶ 38 ("I do not know what a metabolic disorder is *in this context*." (emphasis added)); ECF No. 16-3, Dellinger Decl. ¶ 29 ("I have no idea what the reference to 'metabolic disorder' means *in this context*." (emphasis added)). But at least one metabolic disorder does arise in the context of abortion: an electrolyte abnormality from blood loss. Francis Decl. ¶ 19. "This disorder could have serious consequences, ranging from temporary confusion to coma or cardiac arrest." *Id.* Therefore, it is crucial for doctors to identify and report such disorders.

**(14) Hypoglycemia occurring while the patient is being treated at the abortion facility**

Similarly, Planned Parenthood does not argue that hypoglycemia, or low blood sugar, is difficult to identify, but simply that it does not happen as a result of abortion. ECF No. 16-2, Stutsman Decl. ¶ 36; ECF No. 16-5, Holmquist Decl. ¶ 41. But hypoglycemia *could* result from a patient being required to fast in preparation for a surgical abortion for which an anesthetic is being used. Francis Decl. ¶ 22. If Planned Parenthood does not require fasting for its abortions, then it may never have need to report this complication. Moreover, the term hypoglycemia is limited to "occurring

while the patient is being treated at the abortion facility," meaning that physicians are not required to identify hypoglycemia that occurs once the patient has left, whether or not as a result of the abortion.

### (22) Physical injury associated with treatment performed at the abortion facility

The term "physical injury" is similarly limited because it includes only those physical injuries "*associated with treatment* performed at the abortion facility."  Ind. Code § 16-34-2-4.7(a)(22) (eff. July 1, 2018) (emphasis added).  Planned Parenthood's examples of the potential "complications" that could be included under this provision strain the limits of credulity.   The ordinary meaning of treatment in the medical context includes "medical care given to a patient for an illness or injury." Oxford Dictionary, *available at* https://en.oxforddictionaries.com/definition/treatment (last visited Jun. 1, 2018). It does not include "verbal explanation[s]" as Planned Parenthood suggests.  *See* ECF No. 16, Pl.'s Mem. 24.  No reasonable physician would interpret this complication to include a stubbed toe at the abortion facility.  *See* ECF No. 16-1, Gillespie Decl. ¶ 31.  Moreover, because the statute has to do with includes only "abortion *complications*," Ind. Code § 16-34-2-4.7(a) (emphasis added), it does not include the type of physical injuries that are normal side effects of the abortion. Therefore, "the type of soreness following a surgical abortion that might be associated with any minor surgery" would not be included.  ECF No. 16, Pl.'s Mem. 24; *see also* ECF No. 16-2, Stutsman Decl. ¶ 41; ECF No. 16-3, Dellinger Decl. ¶ 24.

### (23) Adverse reaction to anesthesia or other drugs

Planned Parenthood claims that "adverse reaction to anesthesia or other drugs" is vague because it does not know whether a "mild reaction to the sedative" is included.  ECF No. 16-1, Gillespie Decl. ¶ 32; ECF No. 16-2, Stutsman Decl. ¶ 40; ECF No. 16-3, Dellinger Decl. ¶ 24.  But once again, this complication must be interpreted in light of the general definition for abortion complications, which includes "*any* adverse physical or psychological condition arising from the induction or performance of an abortion."  Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018) (emphasis added).  Therefore, the complication includes any reaction that is not a normal side effect to anesthesia, whether general or local, no matter how mild.  A rash, for example, "is not a normal side effect of anesthesia. A rash is a sign of an allergic reaction, which can be very serious."  Francis Decl. ¶ 24.  Therefore, "[a]ny allergic reaction is a significant complication that should be reported."  *Id*.

### (24) Psychological or emotional complications, including depression, suicidal ideation, anxiety, and sleeping disorders

While Planned Parenthood contends that there are no "psychological or emotional complications of abortion," *see* ECF No. 16-5, Holmquist Decl. ¶ 45, the Supreme Court has recognized that "it seems unexceptionable to conclude some women come to regret their choice to abort the infant life they once created and sustained."  *Gonzales v. Carhart*, 550 U.S. 124, 159 (2007).  Regardless, Planned Parenthood need only report the psychological and emotional complications that it actually observes in its patients.

Planned Parenthood acknowledges that "psychological complications" are easily identified, but argues that the term "emotional complication" is unconstitutionally vague. *See* ECF No. 16-2, Stutsman Decl. ¶ 39. "While there is no official medical definition of an 'emotional complication,' it is commonly understood as any emotional disturbance related to the abortion, including Dr. Dellinger's example in paragraph 28 of her declaration of a woman who feels sad after an abortion." Francis Decl. ¶ 26. Therefore, "[w]hen a patient seeks treatment for minor depression or anxiety, perhaps years after the fact," ECF No. 16, Pl.'s Mem. 24, this qualifies as a psychological or emotional complication (although the duty to report would fall on the doctor that treats the complication, rather than the doctor that performed the abortion). Because it would be difficult, if not impossible, to prove that the "depression or anxiety would have been more severe if the patient had continued the pregnancy," or that "the depression results not from the abortion-as-such but rather from the reaction of a family-member who is morally opposed to abortion," *id.*, both must be reported as complications of the abortion. Planned Parenthood's example of reporting when a "family-member (rather than the abortion patient) seeks treatment for depression because a loved one obtained an abortion" strains credulity. *Id.* at 24 n.14. From a medical standpoint, people are not considered to have "complications" from other people's procedures. Francis Decl. ¶ 27. Moreover, since a woman would likely go to a psychiatrist for treatment of psychological or emotional complications, rather than back to the doctor that performed the abortion, Planned Parenthood will not likely ever need to report this

24

type of complication, meaning that Planned Parenthood lacks standing to challenge it.

### (26) Any other adverse event as defined by criteria provided in the Food and Drug Administration Safety Information and Adverse Event Reporting Program

The parameters of the final complication in the Reporting Requirement are defined by federal law.  FDA regulations define "adverse event" as "any untoward medical occurrence associated with the use of a drug in humans, whether or not considered drug related."  21 C.F.R. § 312.32.  Because the FDA regulates only adverse events resulting from the administration of a drug, this complication would include adverse events arising from medication abortions or from any other drug administered during an abortion procedure, such as drugs used during sedation for a surgical abortion.  If Planned Parenthood does not understand what is included in this type of "adverse event," then it is federal law, rather than state law, that is vague.

### C.  The specific complications in the statute are severable from the Reporting Requirement

Even if some of the complications listed in the Reporting Requirement are vague, those vague complications are severable from the remainder of the statute. Whether an unconstitutional portion of a state law can be severed is a question of state law. *Exxon Corp. v. Eagerton*, 462 U.S. 176, 196-97 (1983).  Indiana has a general statutory presumption in favor of severability.  Ind. Code § 1-1-1-8(b).  A provision is presumed severable from the remainder of the statute unless: (1) "the remainder is so essentially and inseparably connected with, and so dependent upon, the invalid provision or application that it cannot be presumed that the remainder

would have been enacted without the invalid provision or application;" or (2) "the remainder is incomplete and incapable of being executed in accordance with the legislative intent without the invalid provision or application." *Id.*

Here, neither condition for defeating severability is met. First, the complications listed in the Reporting Requirement are completely independent of one another. Even if, for instance, this Court holds that the complication "metabolic disorder" is vague and therefore, cannot be reported, that holding would have no bearing on the vagueness or reportability of "uterine perforation" or "incomplete abortion." Second, the purpose of the Reporting Requirement is to collect data regarding the types of complications that result from abortion and the frequency of those complications. This purpose is best served by requiring as many abortion complications to be reported as possible, even if some of the more vague complications are stricken from the statute. Therefore, any complication that is held to be unconstitutionally vague should be stricken from the statute, but the remainder of the Reporting Requirement should be upheld.

## PLAINTIFFS HAVE NOT DEMONSTRATED IRREPARABLE HARM

In order to prevail on a motion for a preliminary injunction, PPINK must establish that the denial of such an injunction will result in irreparable harm. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "'Irreparable' in the injunction context means not rectifiable by the entry of a final judgment." *Walgreen Co. v. Sara Creek Prop. Co.*, 966 F.2d 273, 275 (7th Cir. 1992) (citations omitted). Planned Parenthood does not specify any negative consequences of complying with the statute,

since all its doctors would have to do to comply would be to keep track of the compilations that they observe. *See* ECF No. 16, Pl.'s Mem. 32–33. For the reasons provided above, each provision challenged by PPINK is constitutionally permissible. Accordingly, PPINK is not facing the denial of its constitutional rights.

## PUBLIC POLICY AND THE BALANCE OF EQUITIES FAVOR THE STATE

To prevail on a motion for preliminary injunction, Plaintiffs "must show that the probability of success on the merits is sufficiently high—or the injury from the enforcement of the order sufficiently great—to warrant a conclusion that the balance of error costs tilts in favor of relief." *Ill. Bell Tel. Co. v. WorldCom Tech., Inc.*, 157 F.3d 500, 503 (7th Cir. 1998). When the party opposing the motion for preliminary injunction is a political branch of government, the restraint for issuing such an injunction is particularly high due to public policy considerations, as "the court must consider that all judicial interference with a public program has the cost of diminishing the scope of democratic governance." *Id.*

The citizens of Indiana have a strong interest in the implementation of the laws passed by their duly elected representatives. *United States v. Rural Elec. Convenience Coop. Co.*, 922 F.2d 429, 440 (7th Cir. 1991) ("[T]he government's interest is in large part presumed to be the public's interest."); *see also Fargo Women's Health Org. v. Schafer*, 819 F. Supp. 865, 867 (D.N.D. 1993) (denying motion for stay and injunction pending appeal of an abortion statute and reasoning that "the public interest lies in enforcement of statutes enacted by the people's legislature").

27

Senate Enrolled Act 340 serves the public interest by collecting comprehensive data on the complications that may result from abortion and the frequency of those complications.  Scientists and scholars will be able to rely on that data to assess the overall safety of abortion so that women are better prepared to make an informed abortion decision.  The harm to the State in preventing it from furthering these important policy objectives significantly outweighs any speculative burdens PPINK or their patients may incur in the near term.

Accordingly, the State's interests in enforcement of the Senate Enrolled Act 340 outweigh the harms that PPINK might suffer in the near term, pending a final decision on the merits.  The law should not be preliminarily enjoined.

## CONCLUSION

The Court should deny the Motion for Preliminary Injunction.

Respectfully submitted,

CURTIS T. HILL, Jr.
Indiana Attorney General

By:  */s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Julia C. Payne
Deputy Attorney General

Office of the Indiana Attorney General
IGC-South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov

28

## CERTIFICATE OF SERVICE

I hereby certify that on June 1, 2018, a copy of the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to the following:

Kenneth J. Falk
ACLU OF INDIANA
kfalk@aclu-in.org

Jan P. Mensz
ACLU OF INDIANA
jmensz@aclu-in.org

Gavin M. Rose
ACLU OF INDIANA
grose@aclu-in.org

Carrie Y. Flaxman
PLANNED PARENTHOOD
FEDERATION OF
AMERICA
Carrie.flaxman@ppfa.org

*/s/ Thomas M. Fisher*
Thomas M. Fisher
Solicitor General

Office of the Attorney General
Indiana Government Center South, Fifth Floor
302 West Washington Street
Indianapolis, Indiana 46204-2770
Telephone: (317) 232-6255
Fax: (317) 232-7979
Email: Tom.Fisher@atg.in.gov