UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF<br>INDIANA AND KENTUCKY, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-1219-RLY-DLP |
| | ) | |
| COMMISSIONER, INDIANA STATE<br>DEPARTMENT OF HEALTH, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**Plaintiff's Reply in Support of Motion for Preliminary Injunction**

### INTRODUCTION

As the plaintiff ("PPINK") previously noted, the "abortion complications" statute, Ind. Code § 16-34-3-4-7 (eff. July 1, 2018), will, in less than one month, subject PPINK and its medical staff to ill-defined and uncertain requirements that imperil them. Contrary to the defendants' ("the State's") arguments, the statute is void as it is unconstitutionally vague, and it also violates both due process and equal protection. A preliminary injunction should issue.

### RESPONSE TO THE STATE'S FACTUAL SUBMISSION

The sole evidence that the State has submitted in this case is through a declaration of Dr. Christina Francis, an obstetrician-gynecologist who does not assert that she has ever performed an abortion, but nonetheless renders a number of opinions based on a limited and selective review of literature.[1] Based on this the State argues that there is insufficient data on abortions

---

[1] As Dr. Francis does not indicate that she has ever performed an abortion or treated the complications— however defined—of this procedure, it seems likely that she lacks the qualifications necessary to render an expert opinion in this cause, *see* Fed.R.Ev. 702; *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). This Court would thus act well within its discretion in excluding her testimony entirely. Indeed, it appears that her only "qualification" for her opinions concerning the potential complications of abortion is that she is familiar with (some of) the professional literature on this subject. But under *Daubert* "[c]ourts are suspicious of purported expertise premised solely or primarily on a literature review." *Smith v. Rasmussen*, 57 F. Supp. 2d 736, 766-67 (N.D. Iowa

1

and their complications and, somewhat oxymoronically, that abortions are proven to be unsafe.[2] However, the evidence does not bear out either of these assertions.

## I.      There is an enormous amount of data concerning abortions and their effects

As PPINK noted in its earlier memorandum (Dkt. 16 at 12), the National Academies of Sciences, Engineering, and Medicine ("National Academies") recently produced a voluminous study entitled *The Safety and Quality of Abortion Care in the United States* (Dkt. 16-1), which Dr. Francis fails to mention. In this study the National Academies, among other things, engaged in a detailed search of the literature concerning short-term and long-term health effects and mental health outcomes following abortion, yielding thousands of citations (Dkt. 16-2 at 195-96).[3] The report concludes that "[t]oday, the available evidence on abortion's health effects is quite robust. There is a great deal of related scientific research, including well-designed randomized controlled trials (RCT's), systematic reviews, and epidemiological studies examining the relative safety of abortion methods and the appropriateness of methods for different clinical circumstances." (Dkt. 16-2 at 33). "Abortion is one of the most frequently studied medical procedures." (Supplemental Declaration of Dr. Stutsman ["Stutsman-Supp."], attached to this brief as Exhibit 1). And, it "is among the most regulated medical procedures in the nation." (Dkt. 16-2 at 37).

## II.     The data demonstrates the safety of abortions

As the Supreme Court noted in *Whole Woman's Health v. Hellerstedt,* --U.S.--, 136 S. Ct.

---

1999) (collecting numerous cases), *aff'd in relevant part*, 249 F.3d 755 (8th Cir. 2001).  This is particularly so when, as noted, Dr. Francis's opinions are based only on a cherry-picked subset of the significant amount of literature devoted to the issue.

[2]      This evidence is even arguably relevant only to PPINK's equal protection and substantive due process arguments. The unconstitutional vagueness of the abortion complications statute exists regardless of any specific facts concerning abortions and abortion complications.

[3]      All citations are to the page numbers assigned by the Court's electronic filing system.

2292 (2016), "abortions taking place in an abortion facility are safe—indeed, safer than numerous procedures that take place outside hospitals." *Id.* at 2315.   Nevertheless, the State attempts to argue that abortions are unsafe. The facts do not bear this out.

Deaths associated with abortions are exceedingly rare:   The one report cited by Dr. Francis that discusses mortality and abortion does not offset the voluminous evidence that demonstrates that "[d]eath associated with a legal abortion in the United States is an exceedingly rare event." (Dkt. 16-2 at 98).[4]   Indeed, even the brochure published by the Indiana State Department of Health notes that there is "one maternal death for every 153,846 legally induced abortions in the United States," and that the risk of death is even lower for the first-trimester abortions performed by PPINK (ranging from 1 death per one million abortions at 8 weeks or less to one death per 250,000 abortions at 11-12 weeks to one death per 58,823 abortions performed at 13-15 weeks). (Dkt. 16-4 at 11). This is to contrast with the risk of death from childbirth, which the Department of Health estimates as 1 death per 6,289 live births. (*Id.*).

Uterine perforations from surgical abortions are also extremely rare:   Although older studies report rates of uterine perforation in surgical abortions at between ≤0.1 percent and 2-3 percent, "the majority of more recent studies . . . report no cases of uterine perforation or note that perforations that occurred were successfully managed conservatively without the need for additional surgery or hospitalization. In the study of almost 35,000 California Medicaid abortions . . . 0.01 percent resulted in perforation." (Dkt 16-2 at 88).

The effect of abortions on subsequent pregnancies and mental health:   There is also a large amount of research in this area, and the National Academies study "identified high-quality

---

[4]     The National Academies were able to get mortality information for abortion, childbirth, colonoscopies, dental procedures, plastic surgery, and tonsillectomies, but were not able to obtain it for other common medical procedures because it was "difficult to find." (Dkt. 16-2 at 98). This merely underscores the fact that there is much more information available about abortions than other procedures.

research on numerous outcomes of interest and concludes that having an abortion does not increase a woman's risk of secondary infertility, pregnancy-related hypertensive disorders, abnormal placentation (after a D&E abortion), preterm birth, breast cancer, or mental health disorders (depression, anxiety, and PTSD)." (*Id.* at 163). The study does note two Finnish studies that found an association between preterm first births after two or more aspiration abortions, although the preterm birth "is more likely if the period between abortion and subsequent conception is less than 6 months (the same is also true of pregnancy spacing in general)" in that "[a] number of studies indicate that a short interpregnancy interval between live births (conception less than 6 months after the previous pregnancy) may be a risk factor for preterm birth." (*Id.* at 155, 163-64).[5]

    <u>The risk of infections is extremely low:</u> Dr. Francis attaches to her declaration a report that discusses the rates of pelvic inflammatory disease and other infections following abortion. (Dkt. 24-1 at 31). However, there is no mention in the report concerning the prescription of antibiotics as a prophylaxis against infection, a protocol recommended for abortion providers and followed by PPINK and other abortion providers in the United States. (Dkt. 16-2 ¶ 25; Dkt. 16-2 at 87). Given this, "[s]erious infection after aspiration . . . is rare" and "universal antibiotic prophylaxis is effective in preventing infection." (Dkt. 16-2 at 87).

---

[5]    The National Academies report also criticized an earlier report by Dr. Coleman, whose later work is cited by Dr. Francis (Dkt. 24-1 at 71), as "fail[ing] to control adequately for preexisting mental disorders" (Dkt. 16-2 at 161). Dr. Coleman's report is also criticized by seminal studies by both the American Psychological Association's Task Force on Mental Health and Abortion and the Academy of Royal Colleges / National Collaborating Centre for Mental Health. (Stutsman-Supp. ¶ 8). This latter report specifically concluded that Dr. Coleman's 2011 report, cited by Dr. Francis, had a "number of methodological problems . . . which brings into questions both the results and conclusions." (*Id.*). In reviewing Dr. Coleman's work, including the report cited by Dr. Francis, Judge Pratt of this Court concluded in 2017, before the National Academies report, and based on the American Psychological Association and the Academy of Royal Colleges studies, that on the issue of whether abortions have negative mental health consequences "PPINK's evidence [concerning the lack of such consequences] is significantly more persuasive on this issue, especially given that Dr. Coleman's studies are the subject of significant criticism." *Planned Parenthood of Ind. & Ky., Inc. v. Commissioner, Ind. State Dep't of Health*, 273 F. Supp. 3d 1013, 1036 (S.D. Ind. 2017), *appeal pending*, No. 17-1883 (7th Cir.).

**ARGUMENT**

**I.     PPINK is likely to prevail on the merits of its claims**

**A.  The statute is unconstitutionally vague**

The challenged statute requires PPINK to file an exhaustive report each and every time it treats a patient for an "abortion complication," defined as "any adverse physical or psychological condition arising from the induction or performance of an abortion."  Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018).  Given that the failure to comply with the statute's reporting requirements subjects PPINK's staff to potential criminal liability and both PPINK and its physicians to possible licensing actions, the statute plainly qualifies as a penal statute subject to the most rigorous definiteness requirements, *see, e.g.*, *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982)—and the State does not argue to the contrary. Nonetheless, the State argues that the statute is not unconstitutionally vague.  This is so, the argument goes, because the statute's list of enumerated "abortion complications" is exhaustive, rather than illustrative, and the specified conditions themselves are not vague.  The State's argument fails.[6]

---

[6]      The State begins its defense to PPINK's vagueness claim by attempting to read a *mens rea* requirement into the challenged statute, although it simultaneously admits that "there may be uncertainty as to what *mens rea* prosecutors will be required to prove."  (Dkt. 24 at 20).  The statute requires some level of criminal intent, argues the State, because the "most analogous reporting statute"—which imposes a duty to report child abuse and neglect if an individual "has reason to believe that a child is a victim," Ind. Code § 31-33-5-1—contains such a requirement.  Of course, even a tacit "reason to believe" standard would seemingly lead to the over-reporting of complications. Regardless, the State's citation only demonstrates that the Indiana General Assembly knows how to craft a reporting statement with a *mens rea* requirement when it chooses to do so.  It did not do so here.  (Moreover, the State does not explain why it believes Indiana Code § 31-33-5-1 to be "the most analogous reporting statute" to the statute at issue in this litigation.  It seems that the statute criminalizing "the failure to complete or timely transmit a form . . . for each abortion performed or abortion inducing drug that was provided, prescribed, administered, or dispensed," Ind. Code § 16-34-2-5(d), is far more analogous to the statute here at issue.  They are phrased in virtually identical terms, and both lack a *mens rea* requirement.)

In any event, even if a *mens rea* requirement were implied in the criminal statute (Ind. Code § 16-34-2-4.7(j) (eff. July 1, 2018)), clearly no such requirement exists before PPINK may be subjected to actions against its license (410 IAC 26-2-8(b)).  And, as noted previously, the Seventh Circuit has been clear that the threat of such licensing actions also implicates void-for-vagueness concerns.  *See, e.g.*, *United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1129-30 (7th Cir. 1984).  Given all this, the State's point is not clear.

1.  The statute's definition of an "abortion complication" is not limited to the twenty-six enumerated examples of such a complication and the definition is unconstitutionally vague

Curiously, the State does not attempt to defend the constitutionality of its statutory definition of an "abortion complication."  As highlighted previously, this definition appears to be so broad that it would require PPINK to file a report every time it provided a patient aspirin for minor soreness, every time it treated normal and expected bleeding caused by an abortion, and every time a patient receiving a non-surgical abortion seeks treatment after experiencing one of the recognized (but minor) side-effects of the medications.  These are all "adverse physical conditions." As PPINK previously demonstrated, there is no meaningful distinction between the "any adverse . . . condition" language at issue here and the "any use . . . that adversely affects" language held to be unconstitutionally vague in *United States v. Sandidge*, 863 F.3d 755, 757 (7th Cir. 2017), and *United States v. Siegel*, 753 F.3d 705, 715 (7th Cir. 2014).

Apparently recognizing this, at no point does the State attempt to defend the statutory language actually at issue here.  Rather, it contends that this language is limited by the purportedly "exhaustive" list of conditions contained within the statute.  The most notable problem with this argument is that nothing in the statutory text remotely suggests that the list of twenty-six conditions is intended to be exhaustive.  After defining "abortion complication," the statute provides that that definition "includes" these enumerated conditions; had the legislature intended the term "abortion complication" to be limited to these conditions, it surely would have said so.  As noted previously, "'[i]nclude' is a word of illustration, not limitation."  *Richardson v. Nat'l City Bank of Evansville*, 141 F.3d 1228, 1232 (7th Cir. 1998).  The State takes issue with PPINK's citation to *Richardson*, insisting that the statute at issue in that case was "much more general" than the statute at issue here.  But *Richardson* relies on the common-sense meaning of

the word "include," and it is not as if that case stands alone.  Rather, "[i]t is hornbook law that the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive."  *Puerto Rico Maritime Shipping Auth. v. I.C.C.*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981).  Courts have reiterated this principle time and again when called on to interpret similarly worded statutes.[7]

Nonetheless, the State relies on the canon of statutory construction that "the expression of one thing implies the exclusion of others"—*expressio unius est exclusio alterius*, to use the Latin.  (Dkt. 24 at 14-15).  The State's argument must be viewed with skepticism from the outset, given that the Seventh Circuit has characterized the canon itself as "beleaguered" (*Exelon Generation Co., LLC v. Local 15, Int'l Brotherhood of Elec. Workers, AFL-CIO*, 676 F.3d 566, 571 (7th Cir. 2012)) and "disfavored" (*Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937, 943 (7th Cir. 2015)).  Accordingly, "[v]irtually all of the authorities who discuss th[is] negative-implication canon emphasize that it must be applied with great caution, since its application depends so much on context."  *United States v. Porter*, 745 F.3d 1035, 1046 (10th Cir. 2014) (quoting Antonin Scalia & Brian A. Garner, *Reading Law: The Interpretation of Legal Texts* 107

---

[7]     *See, e.g.*, *Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 162 (2012) ("[T]he definition is introduced with the verb 'includes' instead of 'means.'  This word choice is significant because it makes clear that the examples enumerated in the text are intended to be illustrative, not exhaustive."); *Fed. Land Bank of St. Paul v. Bismarck Lumber Co.*, 314 U.S. 95, 100 (1941) ("[T]he term 'including' is not one of all-embracing definition, but connotes simply an illustrative application of the general principle."); *Heniff Transp. Sys., LLC v. Trimac Transp. Servs. Inc.*, 847 F.3d 187, 191 (5th Cir. 2017) ("[T]he phrase 'including' in the statute indicates that the examples . . . listed in the statute are an illustrative and non-exhaustive list."); *Stansell v. Revolutionary Armed Forces of Colombia*, 704 F.3d 910, 915 (11th Cir. 2013) ("[T]he term 'means' denotes an exhaustive definition, while 'includes' is merely illustrative."); *In re Kunz*, 489 F.3d 1072, 1078 (10th Cir. 2007) ("Courts have held that the use of the word 'includes' in this section indicates that Congress did not intend for the categories listed to be exclusive."); *United States v. Alvarenga-Silva*, 324 F.3d 884, 887 (7th Cir. 2003) ("[I]t is followed by 'includes,' which signals illustration rather than exhaustion."); *Coleman v. United States*, 318 F.3d 754, 760 (7th Cir. 2003) ("The word 'includes' does not suggest limitation.  In fact, the word is defined as 'comprises a part of the whole.'") (typographical error corrected); *In re Krehl*, 86 F.3d 737, 741 (7th Cir. 1996) ("By virtue of the nonlimiting term 'includes,' the above definition is intended to be illustrative rather than exhaustive."); *Enis v. Continental Illinois Nat'l Bank & Trust Co. of Illinois*, 795 F.2d 39, 42 (7th Cir. 1986) ("The words 'include' and 'such as' show that the specific instances are illustrative, not exhaustive."); *United States v. Angelilli*, 660 F.2d 23, 31 (2d Cir. 1981) ("The use of the word 'includes,' rather than a more restrictive term such as 'means,' indicates that the list is not exhaustive but merely illustrative.") (internal quotation omitted); *United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979) ("[A] list beginning with the word 'includes' . . . is not exhaustive but merely illustrative.").

(2012)).   Given this, courts have repeatedly—and soundly—rejected the application of the *expressio unius* canon to statutes relying on the non-exhaustive term "includes."   The Seventh Circuit did so explicitly in *Dahlstrom*, 777 F.3d at 943 ("Sun Times advocates the application of the [*expressio unius*] canon . . . .   However, the Supreme Court has explained that the term 'including' . . . is typically 'illustrative and not limitative.'") (citation omitted).   And this Court reached the same conclusion in *DirecTV, Inc. v. Cashe*, No. 1:03-CV-0310, 2004 WL 1622229, at *2 (S.D. Ind. June 7, 2004) ("The defendants invoke the [*expressio unius*] canon . . . .   That canon does not apply here, where the definition of 'persons aggrieved' uses the open-ended, instructive term 'include' rather than the more definitive term 'means.'") (Hamilton, J.).   The Tenth Circuit in *Porter* was just as clear:

> Here, "common sense" clearly indicates the inappropriateness of applying the negative-inference canon.   This is because, far from expressing through the statute's text and structure[] that the definition of "means of identification" is an exhaustive, or a comprehensive, expression of intended means—which ordinarily would inferentially exclude other means—Congress, by its use of the term "including," signaled precisely the obverse intent.   More specifically, as commentators have stated: "When a definitional section says that a word 'includes' certain things, that is usually taken to mean that it may include other things as well."

745 F.3d at 1046 (quoting Scalia & Garner, *supra* at 226) (internal citations omitted).   The case law announcing similar principles, and rejecting the precise argument advanced by the State here, is again legion.[8]

   Put another way: the rarely used and much-criticized *expressio unius* canon on which the

---

[8]      *See, e.g.*, *St. Paul Mercury Ins. Co. v. Lexington Ins. Co.*, 78 F.3d 202, 206-07 (5th Cir. 1996) ("[W]e are not convinced that the rule of *expressio unius est exclusion alterius* applies in the instant case, as the challenged list of provision in [the] contract is prefaced by the word 'including,' which is generally given an *expansive* reading.") (emphasis in original) (interpreting an insurance contract); *In re Mark Anthony Construction, Inc.*, 886 F.2d 1101, 1106 (9th Cir. 1989) ("[W]e conclude that that . . . statute's use of 'including' renders the *expressio unius* rule inapplicable."); *Envmtl. Encapsulating Corp. v. City of New York*, 855 F.2d 48, 54-55 (2d Cir. 1988) ("We are reluctant to read the term 'includes' as meaning 'is limited to.' . . .   [I]t would be anomalous to construe [the statute] based simply on a mechanical application of the maxim *expressio unius est exclusio alterius*.").

State rests its entire argument does not and cannot overcome the plain meaning of the word "includes" as used in Indiana Code § 16-34-2-4.7(a) (eff. July 1, 2018).[9]  The State does not attempt to defend the statute's exceedingly vague definition of an "abortion complication," and that definition is not further illuminated by the statute's non-exhaustive list of example "complications."  The statute is void for vagueness, and there is no need to proceed further.

2.  <u>The vagueness of the statutory definition of an "abortion complication" cannot be, and is not, remedied by the twenty-six enumerated examples of such a complication</u>

Rather than defend the constitutionality of the statute's definition of an "abortion complication," the vast majority of the State's vagueness argument is spent defending the precision of the enumerated examples of such a complication.  (*See* Dkt. 24 at 23-32).  The State's lengthy argument depends on the success of its ill-fated contention that the twenty-six examples of "abortion complications" enumerated in Indiana Code § 16-34-2-4.7(a) are exhaustive rather than illustrative, and it is therefore unnecessary to treat its contentions that the specific conditions identified by the statute are not vague at any length.  After all, even though some conditions might possess a sufficiently precise meaning, this Court has recently rejected the State's argument (applied to a different abortion regulation) that an otherwise vague statute may survive a void-for-vagueness challenge simply because there are circumstances "that would clearly satisfy the statutory requirements."  *See Planned Parenthood of Ind. & Ky., Inc. v. Commissioner, Ind. State Dep't of Health*, 258 F. Supp. 3d 929, 949-50 (S.D. Ind. 2017), *appeal pending limited to other issues*, No. 17-2428 (7th Cir.).  "If that were in fact an accurate

---

[9]    There is, of course, a certain irony to the State's invocation of the *expressio unius* maxim in this vagueness challenge.  After all, the void-for-vagueness doctrine itself requires definiteness in penal statutes in order to ensure that persons are on notice of their obligations under the law and to ward against arbitrary enforcement.  *See, e.g.*, *Kolender v. Lawson*, 461 U.S. 352, 357-58 (1983).  The invocation of a wholly discretionary, context-specific, and "beleaguered" maxim to insist that the term "includes" means something other than "includes" obviously does nothing to advance the purposes of the vagueness doctrine.

statement of the law, a number of prior cases that have held statutes void for vagueness would have been wrongly decided." *Id.* at 950 (describing precedent).

Nonetheless, even were it necessary to consider the State's vagueness arguments concerning the specific statutory examples of "abortion complications," these arguments are without merit. For instance, the statute lists "blood clots" as one such complication. While the State does not deny that the passage of clots is normal and expected condition associated with abortions, particularly a medication abortion, it insists that the statute must be understood to refer only to "deep-vein thrombosis and pulmonary embolisms." (Dkt. 24 at 27). Similarly, it interprets the term "hemorrhaging" to refer only to "serious bleeding that requires urgent medical attention" (Dkt. 24 at 26), even though the State's "urgent medical attention" requirement appears to have been created out of whole cloth, *see, e.g.*, MedicineNet.com, *Hemorrhage*, *at* https://www.medicinenet.com/script/main/art.asp?articlekey=14263 (last visited June 4, 2018) ("[b]leeding or the abnormal flow of blood"); Merriam-Webster, *Hemorrhage*, *at* https://www.merriam-webster.com/dictionary/hemorrhage (last visited June 4, 2018) ("a copious or heavy discharge of the blood from the blood vessels").

In neither case is the State's definition what the statute actually says. The State cannot defeat a vagueness challenge, as it attempts to do, simply by having a physician offer her interpretation of disputed statutory language. Not only does Dr. Francis's disagreement with PPINK's witnesses' interpretation simply underscore the fact that the statute is not susceptible to definite meaning, but one of the purposes of the vagueness doctrine is to prevent arbitrary enforcement: the fact that Dr. Francis might interpret the phrase "blood clots" to refer only to some subset of blood clots is certainly no guarantee that county prosecutors or the Indiana Medical Licensing Board will do the same. Indeed, as noted previously, literature from the

Indiana State Department of Health itself emphasizes that some blood clots or heavy bleeding are to be expected following an abortion. (Dkt. 16-4 at 8-10). The State may not contend that "blood clots" means one thing in the challenged statute and a different thing in its own literature, and that the term somehow is still sufficiently precise to avoid vagueness concerns.

The State's argument with respect to other statutory examples of "abortion complications" is even further afield. It appears to acknowledge that the terms themselves are not susceptible of definite meaning, and could refer to numerous normal, expected, or otherwise minor events. But it insists that the statute cannot be interpreted in that manner because the statute itself specifically concerns complications. (*See* Dkt. 24 at 22 ["{B}ecause the statute has to do with only 'abortion *complications*' . . . it does not include the type of physical injuries that are normal side effects of the abortion."] [emphasis in original]; *id.* at 23 ["{T}he complication includes any reaction that is not a normal side effect to anesthesia.]; *id.* at 31 ["From a medical standpoint, people are not considered to have complications from other people's procedures."]). This argument is inherently circular: PPINK is challenging the vagueness of the statutory definition of an "abortion complication," and the State simply may not defend this definition on the basis of the term that is being defined. Again, the fact that the State seemingly has to add verbiage to the statute in order to even advance a cognizable argument that the statute is sufficiently definite only underscores the statute's vagueness.[10]

---

[10] The State also insists that the statute's incorporation of the federal definition of an "adverse event" is not vague simply because that definition "is federal law, rather than state law." (Dkt. 24 at 32). Of course, the State cannot escape liability simply because it has chosen to incorporate an indefinite provision of federal law—and the federal definition ("any untoward medical occurrence associated with the use of a drug") certainly lacks specificity. *See* 21 C.F.R. § 312.32(a). In any event, unlike the State's use of the term in the challenged statute, it does not appear that the federal government relies on the term in any manner that would require definiteness: not only do no penal consequences attach to the federal definition, but an "adverse event" need not even be reported under federal law; rather, it is only a "serious adverse event or serious suspected adverse reaction"—a term defined with significantly greater precision—that must be reported to the Food and Drug Administration. *See* 21 C.F.R. § 312.32(c)(1).

As noted, PPINK's vagueness challenge concerns the imprecision in the actual statutory definition of an "abortion complication"—"any adverse physical or psychological condition arising from the induction or performance of an abortion"—which the State does not even attempt to defend.  There is therefore no reason to address the precision of the statutory examples of such a "complication."   But, even were that not so, these examples underscore, rather than remedy, the statute's vagueness.  The statute is unconstitutional.[11]

### B.   The statute is fundamentally irrational and violates substantive due process

The parties agree that the State has a legitimate interest in disseminating accurate, non-misleading information that might inform the decision whether or not to obtain medical care, including abortion.  *See, e.g.*, *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 881-83 (1992) (plurality). However, this decision can be informed only if the events being reported are serious. In fact, the State already furthers this interest by requiring hospitals, ambulatory outpatient surgical centers, and abortion clinics to inform the Indiana State Department of Health of "reportable events," which are serious complications following a surgery or other medical treatment.  *See* 410 IAC 15-1.4-2.2 (hospitals); 410 IAC 15-2.4-2.2 (ambulatory outpatient surgical centers); 410 IAC 26-6-2 (abortion clinics).  The State also requires abortion providers to submit terminated pregnancy reports to the State Department of Health following each abortion (surgical or medication), which requires providers to indicate if the abortions resulted in hemorrhaging[12], infection, uterine perforation, cervical laceration, or retained product. (Dkt 18-1

---

[11]     The State concludes its vagueness defense by suggesting that the twenty-six examples of "abortion complications" are severable from one another in the event that the Court determines one or more of the examples to be unconstitutionally vague.  (Dkt. 24 at 32-33).  This argument is wholly dependent on the State's erroneous argument that the twenty-six statutory examples represent an exhaustive list of "abortion complications."  What PPINK has challenged is the statutory definition of an "abortion complication" itself.  If this definition is deemed unconstitutionally vague, as it must be, the entire statute falls and there is nothing to sever.

[12]     Given that the terminated pregnancy report does not, unlike the challenged statute, define the term "hemorrhaging" to mean "any adverse condition," PPINK's doctors have been free to apply a definition involving

at 9).  This is a rational way for the State to pursue its interest in collecting data on abortion complications.  The challenged statute is not.

The statute mandates reporting of "complications" that include normal condition following an abortion, and physical and psychological conditions that may have nothing to do with the abortion.  It requires the reporting of such complications under the threat of criminal and licensing penalties, putting at risk the livelihood of doctors who provide abortions and who treat patients who have had abortions.  This will, by design, inevitably lead to over-reporting if there is any question that a condition following an abortion could in some tangential way be related to the abortion, and the Department of Health will produce public summaries of that data that purport to represent statistics on abortion complications.  Ind. Code § 16-34-2-4.7(g) (eff. Jul. 1, 2018).  This is not only unnecessarily burdensome on providers, but will actually make the State's data inaccurate and will mislead individuals seeking to make informed decisions on whether to seek an abortion.

On the one hand, the State argues that doctors will not have to report the "normal effects associated with abortions" such as "normal bleeding and clotting" (Dkt. 24 at 5), but on the other hand the State claims, on behalf of women undergoing abortions, a "strong interest in knowing *all* possible outcomes of the abortion, including both serious complications, no matter how rare, *and* normal side effects, no matter how minor" (*id.* at 6).  This only highlights the dilemma abortion providers face in complying with the statute, and why they will inevitably report expected and insignificant events that are normally occurring conditions associated with the abortion, even if they do not consider them to be medical complications.  This is irrational and violates due process.

---

serious and unexpected bleeding. (Dkt. 16-1 ¶ 30.)  However, this freedom has been removed by the statute, which is "ambigu[ous] as to when bleeding becomes 'reportable' bleeding. (Dkt. 16-5 ¶ 50).

The State cites the district court decisions in *Planned Parenthood of Se. Pennsylvania v. Casey*, 686 F. Supp. 1089, 1131 (E.D. Pa. 1988) ("*Casey I*"), and *Planned Parenthood of Se. Pennsylvania v. Casey*, 744 F. Supp. 1323, 1392-93 (E.D. Pa. 1990) ("*Casey II*"), *aff'd in part & rev'd in part*, 947 F.2d 682 (3d Cir. 1991), *aff'd in part & rev'd in part*, 505 U.S. 833 (1992).   In *Casey*, the district court considered Pennsylvania's mandatory reporting requirement for medical complications following an abortion.  *Casey I*, 686 F. Supp. at 1131.  The statute did not attempt to define what a "complication" was for purposes of the requirement, and the court noted that "[u]niform definitions of complications are difficult to achieve."   *Id.* at 1119.  Instead, the statute left it to "the good faith judgment of the physician" to determine whether, in the course of providing follow-up treatment, a physician considers it to be a medical complication caused by the abortion.  *Id.* at 1118.  Therefore, doctors by and large were likely to only report serious complications that go beyond the normal and expected side-effects that the medical community considers an actual complication.   And, significantly, no penalty attached to this reporting requirement.  The court ultimately held that although there was some possibility of over- and under-reporting, and significant discretion left to the physicians to define complications, the data was not "statistically meaningless." *Id.* at 1132.  This holding was not appealed.

The Pennsylvania statute, however, is a far cry from the statute at issue here, which mandates, under threat of criminal prosecution and loss of license, that physicians report any symptom, including normal side-effects, "no matter how minor" (Dkt. 24 at 6), as an abortion complication.   This is a huge difference. Some of the symptoms listed in the statute as complications, such as blood clots, are not symptoms that medical community would consider to be abortion complications, yet they are required to be reported as such.  (*See* Dkt. 16 at 11-12, 17).  Therefore, the State's definition of complication ensures that the data will be statistically

meaningless. This is not rational, and the erroneous data will only serve to misinform patients seeking truthful and reliable information on abortion complications. *See, e.g.*, *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r of Ind. State Dep't of Health*, 888 F.3d 300, 309 (7th Cir. 2018), *pet. for reh'g en banc pending* (finding fetal disposition requirements following abortion procedure was irrational and violated due process where it did not further the state's purported interest in treating fetal remains as human remains). The State's abortion complication reporting requirement violates substantive due process and must be enjoined.[13]

### C. The statute's applicability to the "complications" of abortion, while ignoring the far more common and serious complications of all other medical procedures, violates equal protection

Finally, the statute requires the reporting of "abortion complications" but does not require the reporting of similar or identical "complications" that are more likely to occur following other medical procedures. While the low-level scrutiny demanded of this classification is not particularly rigorous, it is not meaningless. The classification created by the statute is not rationally related to a legitimate state interest, and it is therefore unconstitutional.

The State begins its defense to PPINK's equal-protection claim by insisting that "the Equal Protection Clause protects persons, not procedures," and is therefore not even implicated here. (Dkt. 24 at 15). This argument is a non-starter. As the State appears to acknowledge, the statute discriminates between persons who treat statutorily defined "abortion complications" and those who treat the "complications" of all other medical procedures. From this premise, however, the State leaps to the conclusion that PPINK is merely complaining that the statute

---

[13]     The State cites eight other states that have abortion complication reporting requirements. (Dkt. 24 at 14 (citing Ariz. Rev. Stat. Ann. § 36-2162 (eff. Dec. 31, 2018); Mich. Comp. Laws Ann. § 333.2837; Minn. Stat. Ann. § 145.4132; Miss. Code Ann. § 41-41-77; N.D. Cent. Code § 14-02.1-07; Okla. Stat. tit. 63, § 1-738i – 1-738q; 18 Pa. Cons. Stat. § 3214(h); Tex. Health & Safety Code Ann. § 171.006)). Only the Pennsylvania's statute, in *Casey*, and North Dakota's statute have been challenged, and in North Dakota the plaintiffs did not challenge the complication reporting requirement itself, but only the statute's definition of a "record" for purposes of its record keeping requirement. *Leigh v. Olson*, 497 F. Supp. 1340, 1350-51 (D. N.D. 1980) (finding seven-year record keeping requirement for abortion facilities and hospitals not unconstitutionally vague).

possesses a "disparate impact" on abortion providers.  Not so.  While that is surely true, and this fact underscores the burden that the statute imposes on abortion providers such as PPINK, PPINK's equal-protection argument is just as applicable to *any* provider that treats an "abortion complication."  PPINK, of course, does not have standing to represent those other providers.  Courts routinely reach the merits of equal-protection claims where a statute by its terms differentiates between *objects* rather than *persons*.  *See, e.g.*, *Bush v. Gore*, 531 U.S. 98, 105-07 (2000) (disparate treatment of ballots); *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 462-70 (1981) (disparate treatment of certain milk containers).  So too here.

The issue, then, is whether the classification created by the statute rationally advances a legitimate state interest.  The primary justification that the State offers for its discriminatory treatment of "abortion complications" is its assertion that "the complications of abortion are more difficult to track" than the complications of other medical procedures.  (Dkt. 24 at 17).  As noted, the evidence demonstrates that complications from abortions have been tracked in numerous studies and reports. Nevertheless, the State hypothesizes a difficulty in tracking because "women who suffer complications from abortion are not always treated for those complications by the same doctor who performed the abortion."  (*Id.*).  Initially, the State's justification appears to be at odds with its recognition, in advancing its "disparate impact" argument, that "abortion doctors and clinics are more likely to treat patients for the complications of abortion [than other providers]."  (*Id.* at 16).  Regardless, there are at least three problems with the State's argument.  First, the fact that providers may treat complications of medical procedures performed elsewhere is not remotely unique to abortion.  A person suffering serious adverse effects from *any* medical intervention will seek treatment at the emergency room.  A person experiencing psychological consequences from a medical procedure will seek mental

health treatment.  And so forth.  Second, even were that not so, the State does not even track complications that are treated (or likely to be treated) by the same medical provider who performs an initial non-abortion procedure.  A substantial percentage of patients receiving an appendectomy might experience minor swelling in the left big toe and, even if the swelling was always treated by the same doctor that performed the appendectomy, the State would be none the wiser.  The State may not advance a justification premised on the difficulty in tracking medical complications when it *never* makes an effort to track medical complications.  And third, the statute does not differentiate between "abortion complications" treated by the abortion provider and those treated by other medical providers.  If the State was interested simply in tracking abortion complications treated by doctors who did not perform the abortion, one would expect that abortion providers such as PPINK would be wholly excluded from the reach of the statute.  The State's justification simply does not pass muster.

Not satisfied with this, the State insists that it has a particularized interest in collecting information relating to "abortion complications" insofar as that information may "better inform a woman's choice whether or not" to obtain an abortion.  (Dkt. 24 at 18).  As noted, PPINK certainly recognizes that states possess an interest in disseminating accurate, relevant information that might inform this decision.  But this interest is again not remotely advanced when the term "abortion complication" is defined so broadly that it includes any minor physical or emotional discomfort, as well as the normal and expected effects of the abortion procedure itself.  Rather than assisting women in making a fully informed decision, the statute will instead advance a false narrative that abortion has a high complication rate and is therefore dangerous.  A pregnant woman who hears that a significant number of all surgical abortion patients experience "complications" of that procedure is not going to recognize that those complications are not

17

unexpected or abnormal events but include the type of minor discomfort that one might expect after *any* minor surgery; when that same woman hears that the vast majority of medication abortion patients experience "complications," she is not going to recognize that that term includes the types of minor transient conditions that are expected.  Were the State's goal to ensure fully informed decisionmaking, it would require the reporting of similar "complications" of childbirth: no matter how "complications" are defined, it is only meaningful information to a patient contemplating abortion if she is also made aware of the (much higher) likelihood of "complications" resulting from childbirth. But, there is no such requirement, and the "informed decisionmaking" rationale does not pass muster even under the most deferential scrutiny.[14]

The State's decision to require the reporting of "abortion complications" but not the reporting of the more serious and more frequent complications of any other medical procedure is not rationally related to a legitimate state interest.  The statute violates equal protection.

## II.   The remaining requirements for preliminary relief are met here

### A.  PPINK is facing irreparable harm for which there is no adequate remedy at law

If a preliminary injunction does not issue, PPINK and its physicians will be subject to criminal penalties and the revocation of their medical licenses if they violate the unconstitutionally vague complications reporting requirement.  This, despite the fact that the

---

[14]     Both the State and its expert point to the supposed "sparsity" of meaningful data on abortion complications. (Dkt. 24 at 18).  As noted at the outset, this is simply untrue: presumably because of the controversial nature of the abortion decision, the procedure is among the most studied medical interventions out there, and a wide array of professional literature concerning the risks of the procedure is easily available.  In fact, as noted previously, the brochure published by the Indiana State Department of Health indicates that fewer than 0.5% of abortion patients experience significant complications.  (Dkt. 16-4 at 10).  Clearly Indiana's own health department does not even believe in the State's assertion that insufficient evidence concerning the complications of abortion exists.

The State's citation to the Seventh Circuit's decision in *Planned Parenthood of Wisconsin, Inc. v. Van Hollen*, 738 F.3d 786 (7th Cir. 2013), is therefore curious.  Far from detailing a "lack of evidence regarding the occurrence of abortion complications" (Dkt. 24 at 19), the court in *Van Hollen* cited multiple studies demonstrating that abortion is significantly safer than a colonoscopy.  *See* 738 F.3d at 790.  In other words, the court was not pointing to a void in the professional literature but simply to the fact that the professional literature did not support Wisconsin's position. The same is true here, and the substantial literature described above wholly undercuts the State's tracking argument.

reporting requirement is fundamentally irrational and is not required for other medical procedures that are far more dangerous than an abortion.  As a result, PPINK and its physicians will be forced to choose between reporting everything, against their medical judgment and in violation of their constitutional rights, and only reporting rare events that are understood by the medical community as complications, which will risk licensing and criminal penalties.   This violates PPINK's rights under the Fourteenth Amendment, and it is well-established that the denial of constitutional rights is irreparable harm in and of itself.   *See, e.g.*, *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). There is no remedy at law for such harm, and this requirement is easily met.

### B.  Public policy and the balance of harms favor a preliminary injunction

Finally, the State argues that the balance of harms and public interest factors weigh against preliminary relief.  (Dkt. 24 at 26-27).  First, it insists generally that the public has an interest "in the implementation of the laws passed by their duly elected representatives." (*Id.*). However, this argument evaporates entirely when a state law is unconstitutional, for the public simply "does not have an interest in the enforcement of state laws that conflict with federal laws." *Prof. Towing & Recovery Operations of Ill. v. Box*, No. 08 c 4096, 2008 WL 5211192, at *14 (N.D. Ill. Dec. 11, 2008) (citing *Felder v. Casey*, 487 U.S. 131, 138 (1988)).  The same is certainly true of state laws that conflict with the U.S. Constitution—for the public also "has a strong interest in the vindication of an individual's constitutional rights," *O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984)—and the number of occasions on which this Court has found this factor met in recent years notwithstanding the fact that plaintiffs were seeking preliminary relief against duly enacted state statutes scarcely deserves mention, *see, e.g.*, *Planned Parenthood of Ind. & Ky., Inc. v. Commissioner*, 984 F. Supp. 2d 912, 930-31 (S.D. Ind.

19

2013); *Buquer v. City of Indianapolis*, 797 F. Supp. 2d 905, 925 (S.D. Ind. 2011); *Planned Parenthood of Ind., Inc. v. Commissioner*, 794 F. Supp. 2d 892, 913 (S.D. Ind. 2011), *aff'd in part & rev'd in part on other grounds*, 699 F.3d 962 (7th Cir. 2012).[15]

Second, the State, echoing its argument on the merits, argues that the public has a strong interest in collecting data on abortion complications. (Dkt. 24 at 35). Of course, the State already collects data on abortion complications in a manner consistent with what is collected for other medical procedures and consistent with what the medical community considers to be complications ascribed to abortions. All an injunction would do is maintain the status quo and prevent the State from collecting meaningless data that only serves to misinform the public. The harm to the plaintiff is concrete and real: PPINK and its physicians face criminal fines and the loss of their licenses if they fail to comply with a vague and irrational reporting requirement. The balance of harms and public interest weigh strongly in favor of PPINK.

## CONCLUSION

For the foregoing reasons, as well as those stated previously, this Court should preliminarily enjoin the enforcement of Indiana Code § 16-34-2-4.7 (eff. July 1, 2018), without bond.

---

[15] The State cites two cases for its assertion that the public has a "strong interest" in ensuring the implementation of duly passed state laws. But *United States v. Rural Electric Convenience Cooperative Co.*, 922 F.2d 429 (7th Cir. 1991), is a unique case where the federal government sought to enjoin a "competing state court proceeding" in favor of the federal forum and in light of the "superior federal interests" involved in the case. *Id.* at 432 (describing the government's invocation of *Leiter Minerals v. United States*, 352 U.S. 220 (1957)). In such cases, the government's likelihood of success "is not relevant to the consideration of motions for injunctive relief." *Id.* at 439. And in *Fargo Women's Health Organization v. Schafer*, 819 F. Supp. 865 (D.N.D. 1993), the district court acknowledged the public interest in enforcing state statutes only after entering summary judgment in favor of the defendants and concluding that the plaintiffs were not likely to succeed on appeal, *id.* at 866-67—a determination that proved prescient given the Eighth Circuit's affirmance of the merits-based decision, *see* 18 F.3d 526 (8th Cir. 1994). Neither case stands for the proposition that the public retains an interest in enforcing a state statute that likely runs afoul of the Constitution.

s/ _Kenneth J. Falk_

Kenneth J. Falk
No. 6777-49

s/ _Gavin M. Rose_

Gavin M. Rose
No. 26565-53

s/ _Jan P. Mensz_

Jan P. Mensz
No. 33798-49
ACLU of Indiana
2457 E. Washington St.—Suite Z
Indianapolis, IN 46201
317/635-4059
fax: 317/635-4105
kfalk@aclu-in.org
grose@aclu-in.org
jmensz@aclu-in.org

Andrew Beck
Motion to Appear *Pro Hac Vice* to be filed
American Civil Liberties Union Foundation
125 Broad St.—18th Floor
New York, NY 10004
212/549-2641
abeck@aclu.org

Carrie Flaxman
*Pro Hac Vice*
Planned Parenthood Federation of America
1100 Vermont Ave., NW, Suite 300
Washington, D.C. 20005
202/973-4830
carrie.flaxman@ppfa.org

Attorneys for Plaintiff

## Certificate of Service

I hereby certify that on this 6th day of June, 2018, a copy of the foregoing was filed electronically with the Clerk of this Court. Notice of this filing will be sent to the following parties by operation of the Court's electronic filing system and the parties may access this filing through the Court's system.

Thomas M. Fisher, Solicitor General
Julia C. Payne, Deputy Attorney General
Tom.Fisher@atg.in.gov
Julia.Payne@atg.in.gov                    /s/ Kenneth J. Falk
                                          Kenneth J. Falk
                                          Attorney at Law