UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | 1:18-cv-01219-RLY-DLP |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH in her official capacity, PROSECUTORS OF MARION, LAKE, MONROE, and TIPPECANOE COUNTIES, INDIANA, in their official capacities; and THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD OF INDIANA, in their official capacities, | ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

On April 23, 2018, Plaintiff Planned Parenthood of Indiana and Kentucky, Inc.

("PPINK"), filed a Complaint for Declaratory and Injunctive Relief against the Indiana

State Department of Health, the prosecutors of Marion, Lake, Monroe, and Tippecanoe

Counties, and the individual members of the Medical Licensing Board of Indiana

(collectively the "State"), alleging that the reporting requirements set forth in Indiana

Senate Enrolled Act No. 340 (codified as Indiana Code § 16-34-2-4.7) (eff. July 1, 2018)

violate the Due Process and the Equal Protection Clauses of the United States

1

Constitution. On May 7, 2018, PPINK filed a Motion for Preliminary Injunction,[1]

seeking to preliminarily enjoin Enrolled Act 340. On June 8, 2018, after briefing was

complete on this matter, the court held a hearing on Plaintiff's Motion, which consisted

solely of oral argument by counsel. The court, having reviewed the parties' submissions,

the designated evidence, and the applicable law, now finds that a preliminary injunction

should be issued without bond.

The court now issues its Findings of Fact and Conclusions of Law.

## I. FINDINGS OF FACT

### A.      The Challenged Statute

1. According to the State,[2] while there are some studies on abortion complications,

   there is no comprehensive data on the frequency and severity of abortion

   complications. (Filing No. 24-1, Declaration of Christina Francis, M.D. ("Francis

   Decl.") ¶ 7). Without mandatory reporting requirements, the State contends, the

---

[1] PPINK's Complaint and Motion for Preliminary Injunction also challenged Indiana Code § 16-21-2-2.6 (eff. July 1, 2018), which requires the annual inspection of abortion clinics. PPINK withdrew this portion of its preliminary injunction in its Memorandum in Support of Motion for Preliminary Injunction.

[2] PPINK vigorously disputes the State's contention that data on abortion complications is incomplete. They cite, among other things, a voluminous consensus report from the National Academies of Sciences, Engineering and Medicine entitled *The Safety and Quality of Abortion Care in the United States*. (Filing No. 16-2, *The Safety and Quality of Abortion Care in the United States*, attached to the Declaration of John William Stutsman, M.D.). In a chapter of the National Academies Report entitled "The Safety and Quality of Current Abortion Methods," containing more than 230 references, (*see id.* at 103-115), the Report concludes that "[t]he clinical evidence shows that legal abortions in the United States . . . are safe and effective. Serious complications are rare." (*Id.* at 173). Because the court addresses only PPINK's void-for-vagueness challenge, it need not decide this issue.

data regarding abortion complications is incomplete: some doctors will report only the most serious complications, and some may choose not to report at all. (*Id.*). Consequently, it is the State's position that scientists lack data regarding the types of complications that may follow abortion and the frequency with which they occur. (*Id.* ¶ 9).

2. To help remedy the shortage of data regarding abortion complications, and ultimately, to better inform a woman's choice whether to have an abortion, the Indiana General Assembly enacted Indiana Senate Enrolled Act 340. The Enrolled Act creates a new statutory section, Indiana Code § 16-34-2-4.7 (eff. July 1, 2018), that requires physicians, hospitals, and abortion clinics to report to the Indiana State Department of Health information concerning the treatment of any and all patients for "abortion complications."

3. The statute provides:

As used in this section, "abortion complication" means any adverse physical or psychological condition arising from the induction or performance of an abortion. The term includes the following:

(1)   Uterine perforation.
(2)   Cervical perforation.
(3)   Infection.
(4)   Hemorrhaging.
(5)   Blood clots.
(6)   Failure to terminate the pregnancy.
(7)   Incomplete abortion (retained tissue).
(8)   Pelvic inflammatory disease.
(9)   Missed ectopic pregnancy.
(10)  Cardiac arrest.
(11)  Respiratory arrest.
(12)  Renal failure.
(13)  Metabolic disorder.

> (14)   Shock.
> (15)   Embolism.
> (16)   Coma.
> (17)   Placenta previa in subsequent pregnancies.
> (18)   Pre-term delivery in subsequent pregnancies.
> (19)   Free fluid in the abdomen.
> (20)   Hemolytic reaction due to the administration of ABO-incompatible blood or blood products.
> (21)   Hypoglycemia occurring while the patient is being treated at the abortion facility.
> (22)   Physical injury associated with treatment performed at the abortion facility.
> (23)   Adverse reaction to anesthesia or other drugs.
> (24)   Psychological or emotional complications, including depression, suicidal ideation, anxiety, and sleeping disorders.
> (25)   Death.
> (26)   Any other adverse event as defined by criteria provided in the Food and Drug Administration Safety Information and Adverse Event Reporting Program.

Ind. Code § 16-34-2-4.7(a) (eff. July 1, 2018).

4. Prior to February 1, 2019, the Indiana State Department of Health must inform the providers specified above of the new requirements concerning reporting of abortion complications.  Ind. Code § 16-34-2-4.7(f) (eff. July 1, 2018).  However, the law appears to be binding on July 1, 2018. (*See* Filing No. 16-1, Declaration of Christie Gillespie ("Gillespie Decl.") ¶ 26 (testifying "I am aware that the Enrolled Act becomes effective on July 1, 2018, and that neither the Indiana State Department of Health nor the Indiana Medical Licensing Board has indicated that the law is not binding on July 1, 2018.")).

5. The "abortion complications" must be reported to the Indiana State Department of Health on a form to be developed by the Department before February 1, 2019. Ind. Code § 16-34-2-4.7(c), (d) (eff. July 1, 2018).

6. The report must include sixteen items of information.  The items include: the date the patient presented for treatment for the abortion complication; the name, race, and residence of the patient; the type of abortion obtained by the patient; the date of the abortion obtained by the patient; the name of the facility where the abortion took place; whether the complication was previously managed by the abortion provider; the name of the medications taken by the patient as part of the pharmaceutical abortion regimen; a list of each diagnosed complication; a list of each treated complication, with a description of the treatment provided; whether the patient's visit to treat the complications was the original visit or a follow-up visit; the date of each follow-up visit, if any; a list of each complication at a follow-up visit, if any; and a list of each complication treated at a follow-up visit, if any.  Ind. Code § 16-34-2-4.7(e) (eff. July 1, 2018).

7. After August 31, 2019, the failure to report an "abortion complication" will be a Class B misdemeanor.  Ind. Code § 16-34-2-4.7(j) (eff. July 1, 2018).

**B.    PPINK**

8. PPINK operates numerous health centers in Indiana where thousands of women, men, and teens receive reproductive health services and comprehensive sexuality education.  (Gillespie Decl. ¶¶ 5-6).

9. PPINK provides surgical and non-surgical (or "medication") abortions in Indiana at health centers located in Indianapolis, Bloomington, and Merrillville.  (*Id.* ¶¶ 8-9).  In addition, PPINK's health center in Lafayette provides non-surgical abortions.  (*Id.* ¶ 10).

10. Eight physicians provide abortion services at PPINK.  (*Id.* ¶ 12).  Some are employed by PPINK and some are independent contractors.  (*Id.*).  All of these physicians are licensed by the Indiana Medical Licensing Board.  (*Id.* ¶ 13).

## C.    Medication Abortions

11. Medication abortions are available within 70 days after the first day of a woman's last menstrual period.  (*Id.* ¶ 11).

12. In a medical abortion, the patient will ingest two medications in pill form: mifepristone (also known as "RU-486" or by its trade name Mifeprex) and misoprostol.  (Filing No. 16-2, Declaration of John William Stutsman, M.D., FACOG ("Stutsman Decl.") ¶ 16).

13. Mifepristone, taken at the health center, blocks the activity of progesterone, which is a hormone that prepares the lining of the uterus for a fertilized egg.  (*Id.* ¶ 17).  Without progesterone, the lining of the uterus breaks down so that the pregnancy cannot continue.  (*Id.* ¶ 18).

14. Misoprostol, taken 24 to 48 hours later, induces uterine contractions and the opening of the cervix, allowing the contents of the uterus to be expelled, similar to an early miscarriage.  (*Id.* ¶¶ 19-20).

15. Defendant Indiana Department of Health, in its Informed Consent Brochure that is provided to all abortion patients, Ind. Code § 6-34-2-1.5, recognizes that misoprostol "causes cramps, heavy bleeding, and expulsion of the embryo." (Filing No. 16-4, Informed Consent Brochure at 9).  The Brochure also notes that "[i]n addition to bleeding and cramping, you may experience dizziness, nausea,

6

diarrhea, or vomiting; feel temporary abdominal pain; or have a mild fever or

chills.  It is normal to have some spotting or bleeding for up to four weeks." (*Id.*

at 9-10).  These are normal conditions to be expected after a medication abortion.

(Stutsman Decl. ¶ 21; Filing No. 16-5, Declaration of Sabrina Holmquist, M.D.,

M.P.H. ("Holmquist Decl.") ¶ 19; Francis Decl. ¶ 28).

16. Routine abortion aftercare may involve the provision of additional counseling on,

pain medications for, and reassurance regarding, these effects.  (Holmquist Decl. ¶

19).

**D.    Surgical Abortions**

17. Surgical abortions are available through the first trimester of pregnancy.

(Gillespie Decl. ¶ 8).

18. The surgical abortion method used by PPINK involves the dilation of a patient's

cervix and the use of suction and/or instruments to aspirate (or empty) the contents

of the patient's uterus.  (Stutsman Decl. ¶ 22).

19. After a surgical abortion, the patient will be monitored for a period of time before

leaving the center, and will be provided an antibiotic as a prophylaxis against

infection.  (*Id.* ¶¶ 24-25).

20. The Indiana Department of Health's Informed Consent Brochure recognizes that

the normal effects and conditions associated with a surgical abortion include

"cramping and bleeding after the procedure.  It is also normal to have no bleeding.

[The patient] may pass a few blood clots and experience heavy bleeding for a few

days.  [The patient] may have spotting for up to six (6) weeks." (Informed

Consent Brochure at 7; *see also* Stutsman Decl. ¶ 26 (noting the effects described above "are not adverse complications, just the normal effects to be expected after a surgical abortion"); Holmquist Decl. ¶ 22 (noting "these side-effects are expected, typical and temporary and are not considered 'complications'")).

E.    **Complications of Abortion**

21. The State's expert, Christine Francis, M.D., testified that all of the complications listed in Indiana Code § 16-34-2-4.7(a) may result from an abortion.  (Francis Decl. ¶ 12).

22. PPINK's witnesses, William Stutsman, M.D., FACOG, Sabrina Holmquist, M.D., M.P.H., and Carol Dellinger, M.D., disagree.  (Stutsman Decl. ¶ 36; Filing No. 16-3, Declaration of Carol Dellinger ("Dellinger Decl.") ¶ 27; Holmquist Decl. ¶ 42).

## II.    CONCLUSIONS OF LAW

1. To the extent any of the foregoing findings of fact is a conclusion of law, it is hereby adopted as a conclusion of law.  To the extent any of the conclusions of law set forth below is a finding of fact, it is hereby adopted as a finding of fact.

2. The court has jurisdiction of this case pursuant to 28 U.S.C. §§ 1331 and 1343.

A.    **Preliminary Injunction Standard**

3. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008).

4. A motion for preliminary injunctive relief is analyzed in two distinct phases. *Turnell v. Centimark Corp.*, 796 F.3d 656, 661 (7th Cir. 2015).

5.  In the initial, threshold phase, the party seeking injunctive relief bears the burden
    of showing that "(1) absent preliminary injunctive relief, he will suffer irreparable
    harm in the interim prior to a final resolution; (2) there is no adequate remedy at
    law; and (3) he has a reasonable likelihood of success on the merits." *Id.* at 661-
    62.

6.  If the court determines that the moving party has satisfied its burden in the
    threshold phase, the court proceeds to the second, balancing phase. *Id.* at 662.

7.  The court then considers "(4) the irreparable harm the moving party will endure if
    the preliminary injunction is wrongfully denied versus the irreparable harm to the
    nonmoving party if it is wrongfully granted" along with "(5) the effects, if any,
    that the grant or denial of the preliminary injunction would have on nonparties (the
    'public interest')." *Id.* In this second phase, the court uses a "sliding scale" to
    weigh potential harms against the movant's likelihood of success: "the more likely
    he is to win, the less the balance of harms must weigh in his favor; the less likely
    he is to win, the more it must weigh in his favor." *Id.*

**B.    Likelihood of Success on the Merits**

8.  PPINK argues that the reporting requirements set forth in Indiana Code § 16-34-2-
    4.7(b) are unconstitutionally vague.

9.  "It is a basic principle of due process that an enactment is void for vagueness if its
    prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104,
    108 (1972).

10. The void-for-vagueness doctrine requires that penal statutes define offenses "with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *Kolender v. Lawson*, 461 U.S. 352, 357 (1983) (citing cases).  *See also Sessions v. Dimaya*, 138 S.Ct. 1204, 1212 (2018) (plurality) (stating "the doctrine guards against arbitrary or discriminatory enforcement by insisting that a statute provide standards to govern the action of police officers, prosecutors, juries and judges").

11. "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).  For example, the Supreme Court "has expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Id.*  In addition, the Seventh Circuit has recognized that sanctions to an individual's license are sufficiently severe to implicate void-for-vagueness concerns.  *United States ex rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1129-30 (7th Cir. 1984); *Baer v. City of Wauwatosa*, 716 F.2d 1117, 1123-24 (7th Cir. 1983).

12. Although the vagueness doctrine focuses "both on actual notice to citizens and arbitrary enforcement," the U.S. Supreme Court has recognized:

[T]he more important aspect of vagueness doctrine is not actual notice, but the other principle element of the doctrine—the requirement that a legislature establish minimal guidelines to govern law enforcement.   Where the

10

legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep that allows policemen, prosecutors, and juries to pursue their personal predilections.

*Kolender*, 461 U.S. at 358 (internal quotations, citations, and alteration omitted).

13. The challenged statute imposes criminal penalties, after August 31, 2019, if "abortion complications" are not reported.  Ind. Code § 16-34-2-4.7(j) (eff. July 1, 2018).

14. PPINK argues the statutory definition of "abortion complication" is unconstitutionally vague because it includes—without any limitation whatsoever—"*any* adverse physical or psychological condition arising from the induction or performance of an abortion."  Ind. Code § 16-34-2-4.7(a) (emphasis added).

15. PPINK's witnesses, Dr. Stutsman, Dr. Holmquist, and Dr. Dellinger opine that the definition of "abortion complication" is so broad it fails to give them guidance as to what is to be reported and what is not.  (Stutsman Decl. ¶ 32; Holmquist Decl. ¶ 31; Dellinger Decl. ¶ 17).  PPINK's Chief Executive Officer, Christie Gillespie, testified that the definition is "meaningless," as it encompasses on one extreme, death, and on the other extreme, a stubbed toe in the procedure room. (Gillespie Decl. ¶ 29).

16. According to the State, the term "abortion complication" is specifically limited to the twenty-six (26) enumerated conditions.  This enumerated list, the State argues, eliminates any vagueness concerns, as none of the listed conditions are unconstitutionally vague standing alone.

11

17. The States argument falters on several grounds.

18. First, the twenty-six listed conditions are introduced with the statement, "The term [abortion complication] *includes* the following."  Ind. Code § 16-34-2-4.7(a).

19. "It is hornbook law that the use of the word 'including' indicates that the specified list . . . that follows is illustrative, not exclusive."  *Puerto Rico Maritime Shipping Auth. v. I.C.C.*, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981) (citation omitted); *Richardson v. Nat'l City Bank of Evansville*, 141 F.3d 1228, 1232 (7th Cir. 1998) ("'Include' is a word of illustration, not limitation.").

20. The State responds a different result is mandated by the canon of statutory construction called *expression unius est exclusion alterius*—the expression of one thing implies the exclusion of others.

21. In *Dahlstrom v. Sun-Times Media, LLC*, 777 F.3d 937 (7th Cir. 2015), the Seventh Circuit rejected the application of the canon to statutes relying on the non-exhaustive term "includes."  *Id.* at 943 ("Sun Times advocates the application of the [*expressio unis*] canon . . . .  However, the Supreme Court has explained that the term "including" . . . is typically 'illustrative and not limitative.'") (citation omitted).  *See also United States v. Porter*, 745 F.3d 1035, 1046 (10th Cir. 2014) ("When a definitional section says that a word 'includes' certain things, that is usually taken to mean that it may include other things as well.") (internal citations omitted).

22. Therefore, the twenty-six examples in the statute are not the exclusive examples of "abortion complications."

23. Second, the twenty-six enumerated conditions are so broad or vague that they do not remedy the uncertainty of the general definition of "abortion complication." For example, and as Dr. Holmquist observed, the term "hemorraghing" is commonly understood to refer to a significant loss of blood, generally over 500 cc in obstetric and abortion practice.  (*Id.* ¶ 50).  The term is not defined in the challenged statute, however, causing ambiguity as to when expected bleeding becomes "reportable bleeding."  (*Id.*).  Because some blood loss, and the passage of small blood clots—another reportable condition—is expected with abortion, it would be difficult for practitioners to know the threshold for reporting.  (*Id.*).

24. The State's expert, Dr. Francis, opined that Dr. Holmquist's definition of "hemorraghing"—i.e., over 500 cc's of blood loss—is the "correct definition."  (Francis Decl. ¶ 15).  And although "it is common for women to pass blood clots after an abortion," she opines that the types of blood clots which should be reported are those which are far more serious—deep-vein thrombosis and pulmonary embolism.  (*Id.* ¶ 16).

25. Dr. Francis's testimony, which adds language to make the terms more specific, highlights the fact that without this language, the terms are vague and subject to different interpretations by different persons.

26. Third, contrary to the State's interpretation,[3] reportable complications would include "normal" side effects.  Indeed, the definition of "abortion complication" includes "*any* adverse physical or psychological condition" arising from an abortion.  The State cannot avoid a vagueness challenge by adding limiting language which is not there.  Complications with no parameters such as "emotional complications," "adverse reaction to anesthesia or other drugs," and "physical injury associated with treatment performed at the abortion facility" only serve to complicate the matter.

27. Next, the State argues that even if some of the twenty-six complications listed in the challenged statute are vague, those vague complications are severable from the remainder of the statute.  *See* Ind. Code § 1-1-1-8(b) (noting a provision is presumed severable unless two conditions are met).

28. The twenty-six examples are a non-exhaustive list; therefore, severing a number of them will not affect the overall vagueness of the statute or the definition of "abortion complication."

29. The court therefore finds the challenged statute fails to inform PPINK what conduct is prohibited.  Consequently, if PPINK fails to report every "adverse physical or psychological condition" for which patients seek treatment as a reportable condition, no matter how routine, minor, and expected, it and its

---

[3] Dr. Francis testified, "Normal side effects of abortion, including cramping, bleeding . . . and mild abdominal pain are not abortion complications, and thus would not be required to be reported under the statute."  (Francis Decl. ¶ 28).

physicians run the risk of being found in the future by the Indiana Department of

Health or the Indiana Medical Licensing Board to be out of compliance with their

statutory responsibilities, thus imperiling their licenses.

30. Accordingly, the court finds PPINK has a reasonable likelihood of success on its

void-for-vagueness due process challenge.

31. Due to the court's finding that PPINK has a likelihood of success on its void-for-

vagueness challenge, it is unnecessary to evaluate the strength of PPINK's

substantive due process and equal protection claims.  *See Gibson v. Am. Cyanamid

Co.*, 760 F.3d 600, 608 (7th Cir. 2014) (noting that federal courts have a "duty to

avoid opining on federal constitutional issues if possible").  Accordingly, the court

expresses no opinion on those claims.

**C.    No Adequate Remedy at Law**

32. The relief sought by PPINK is a declaratory judgment decreeing the reporting

requirements set forth in the challenged statute are unconstitutional and an order

enjoining its enforcement.  PPINK does not seek money damages.

33. Thus, PPINK has no adequate remedy at law.  *See Gov't Suppliers Consolidating

Services, Inc. v. Bayh*, 734 F.Supp. 853, 863 (S.D. Ind. 1990) (finding no adequate

remedy at law where the plaintiffs sought only declaratory relief and were barred

from recovering damages).

**D.    Irreparable Harm**

34. To satisfy the "irreparable harm" prong, the moving party must show that the

denial of preliminary injunctive relief "will cause harm to [it] that a final judgment

will not be able to rectify." *Ill. League of Advocates for the Developmentally Disabled v. Ill. Dep't of Human Servs.*, 803 F.3d 872, 876 (7th Cir. 2015).

35. Absent a preliminary injunction, PPINK and its physicians will, beginning July 1, 2018, be subject to licensing penalties, and eventually criminal penalties, if they violate the challenged statute.

36. If PPINK and its physicians interpret the statute incorrectly and report less than everything, they risk civil and criminal sanctions.

37. This violates PPINK's due process rights.

38. The violation of constitutional rights constitutes irreparable harm. *Baskin v. Bogan*, 983 F.Supp.2d 1021, 1028 (S.D. Ind. 2014) (citing *Preston v. Thompson,* 589 F.2d 300, 303 n. 3 (7th Cir. 1978) ("The existence of a continuing constitutional violation constitutes proof of an irreparable harm.")); *Overstreet v. Lexington-Fayette Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002) ("Courts have . . . held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights."); *Cohen v. Coahoma Cnty., Miss.,* 805 F.Supp. 398, 406 (N.D. Miss. 1992) ("It has been repeatedly recognized by federal courts at all levels that the violation of constitutional rights constitutes irreparable harm as a matter of law.")).

39. PPINK has established it will suffer irreparable harm if an injunction is not issued.

16

### E.     Balance of Harms and the Public Interest

40. The public has an interest in the enactment of statutes which comply with the Constitution.  *O'Brien v. Town of Caledonia*, 748 F.2d 403, 408 (7th Cir. 1984) (finding the public "has a strong interest in the vindication of an individual's constitutional rights").

41. The State cannot claim that being required to comply with the Constitution is harmful.

42. The balance of harms and the public interest therefore support the issuance of a preliminary injunction in this action.

### F.     Bond

43. "The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

44. Notwithstanding the literal text of Rule 65, a bond is not necessary for a preliminary injunction to take effect.  *See Wayne Chemical, Inc. v. Columbus Agency Services Corp.,* 567 F.2d 692, 701 (7th Cir. 1977) ("Finally, it was not error for the district court to issue the preliminary injunction without a bond. Under appropriate circumstances bond may be excused, notwithstanding the literal language of Rule 65(c).").

45. The purpose of a bond in this context is to compensate a defendant for losses suffered due to an erroneously issued preliminary injunction.  *Ty, Inc. v. Publ'Ns*

*Int'l*, 292 F.3d 512, 516 (7th Cir. 2002).  *See Lakeview Tech., Inc. v. Robinson*, 446 F.3d 655, 657 (7th Cir. 2006) ("Any slight risk can and should be ameliorated by an injunction bond under Fed. R. Civ. P. 65(c).").

46. The amount of the bond is left to the court's discretion.  *Gateway E. Ry. Co. v. Terminal R.R. Ass'n of St. Louis*, 35 F.3d 1134, 1141 (7th Cir. 1994).

47. Here, the State has not claimed that the issuance of a preliminary injunction will cause it to suffer any monetary injuries and the court finds that no such injuries will be caused by the injunction's issuance.

48. Accordingly, no bond will be required.

## III.    CONCLUSION

49. The court finds PPINK has satisfied its burden to obtain a preliminary injunction of Indiana Senate Enrolled Act No. 340.  Therefore, PPINK's Motion for Preliminary Injunction (Filing No. 11) is **GRANTED**.

50. The Commissioner of the Indiana State Department of Health; the Prosecutors of Marion, Lake, Monroe, and Tippecanoe Counties, Indiana; and the Individual Members of the Medical Licensing Board of Indiana, in their official capacities, are hereby **PRELIMINARILY ENJOINED** from enforcing the reporting requirements set forth in Indiana Senate Enrolled Act No. 340.

51. PPINK is not required to post a bond.

**SO ORDERED** this 28th day of June 2018.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.