UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| PLANNED PARENTHOOD OF INDIANA AND KENTUCKY, INC., | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 1:18-cv-01219-RLY-DLP |
| COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH, MARION COUNTY PROSECUTOR, LAKE COUNTY PROSECUTOR, MONROE COUNTY PROSECUTOR, TIPPECANOE COUNTY PROSECUTOR, THE INDIVIDUAL MEMBERS OF THE MEDICAL LICENSING BOARD, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This cause appears before the court on cross-motions for summary judgment. (Filing No. 73; Filing No. 77).  At issue is the constitutionality of two abortion-related Indiana statutes.  Planned Parenthood of Indiana and Kentucky, Inc. alleges Indiana Code § 16-34-2-4.7 (the "Complications Statute") is unconstitutionally vague and violates both equal protection and due process.  Planned Parenthood also brings an equal protection challenge to Indiana Code § 16-21-2-2.6 (the "Inspection Statute").  The State defends the constitutionality of both statutes and asks the court to enter summary judgment in its favor.

1

For the reasons articulated below, the court concludes the Complications Statute is unconstitutionally vague.  Because the Complications Statue is void, the court does not address Planned Parenthood's equal protection and due process challenges.  But the court agrees with the State that the Inspection Statute does not violate equal protection.  Accordingly, Planned Parenthood's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part,** and the State's Motion for Summary Judgment is **GRANTED in part** and **DENIED in part.**

## I.     Factual Background

Planned Parenthood currently operates 17 health centers in Indiana.  (Filing No. 73-2, Declaration of Christine Charbonneau, ¶ 3).  Thousands of women, men, and teens receive reproductive health services and comprehensive sex education at these facilities.  (*Id.* ¶ 4).  Abortion is among the various services offered by Planned Parenthood.  Surgical abortions are performed at three health centers in Indiana: Indianapolis, Bloomington, and Merrillville.  (*Id.* ¶ 5).  Patients undergoing a surgical abortion at one of these Planned Parenthood facilities do not receive general anesthesia, although sedatives may be administered upon request.  (*Id.* ¶ 6).  After the procedure is completed, the patient is monitored for a period before leaving the clinic.  (*Id.*).  Non-surgical abortion—also referred to as medication abortion—is available at the same three facilities, as well as another facility located in Lafayette.  (*Id.* ¶¶ 7-8).  Both surgical and non-surgical abortions are performed by physicians licensed by the Indiana Medical Licensing Board.  (*Id.* ¶ 10).

Abortion clinics, birthing centers, ambulatory surgical centers, and hospitals must be licensed by the Department of Health, and these licenses are effective for one year. *See* 410 Ind. Admin. Code § 26-2-1(c) (abortion clinics); *Id.* § 27-2-1(b) (birthing centers); *Id.* § 15-2.3-1(a) (ambulatory surgical centers); *Id.* § 15-1.3-1(a) (hospitals). Prior to the issuance of an initial license, these entities must be inspected by the Department of Health.  (Filing No. 73-1, Matthew Foster Deposition ("Foster Dep.") at 27).  While Indiana law specifies when abortion clinics and birthing centers must undergo subsequent licensing surveys, it does not specify how frequently hospitals and ambulatory surgical centers must be surveyed.[1]  (*Id.* at 28).  Federal law dictates the minimum frequency of inspections for hospitals and ambulatory surgical centers.  (Filing No. 72, Stipulation, ¶ 2).  Under federal law, the State must inspect hospitals at least once every five years and ambulatory surgical centers every six years, (Filing No. 72-1, Table of Survey Frequencies and Priorities ("Table") at 71, 74), although in practice, the State inspects hospitals and ambulatory surgical centers on a roughly annual basis.[2]  (Foster Dep. at 28).

---

[1] The Department of Health must conduct a licensing inspection of birthing centers at least once every two years. 410 Ind. Admin. Code § 27-3-2.  Prior to the passage of the Inspection Statute, abortion clinics were subject to similar inspection requirements.  *Id.* § 26-3-2 (superseded by emergency rule, eff. Apr. 10, 2019).

[2] From 2013 to mid-October 2018, Indiana hospitals underwent licensing survey inspections once every 15.3 months. (Filing No. 73, Ex. 8, Exhibit Summary Chart Concerning Licensing Inspections).  During that same period, ambulatory surgical centers were inspected once every 16.3 months and birthing centers approximately every 24.4 months. (*Id.*).  Prior to 2018, the state conducted licensing survey inspections of abortion clinics once every 22 months. (*Id.*). Sometime in 2018, the decision was made to inspect every abortion clinic again, even though they had been inspected the year before. (Foster Dep. at 42-43).

Hospitals and ambulatory surgical centers have the option of joining a private accrediting organization which will perform the required federal survey. (*Id.* at 61-63). Under Indiana law, the Health Department must grant licenses to all entities who pass the survey and are members of an accrediting organization. Ind. Code § 16-21-2-13(b)(2). Federal law only requires the State to inspect a 1% targeted sample of member hospitals and 5-10% of ambulatory surgical centers each year. (Table at 70, 74). There is no similar accrediting organization for abortion clinics. (Foster Dep. at 63).

## II.     Procedural and Statutory Background

 In 2018, the Indiana General Assembly passed Senate Enrolled Act No. 340, which included the two provisions at issue here. Concerned with what it felt to be insufficient data regarding the safety of abortion procedures, the General Assembly included a provision which required physicians, hospitals, and abortion clinics to report certain "abortion complications." Ind. Code § 16-34-2-4.7 (amended eff. July 1, 2019). Under that section, an abortion complication was defined as "any adverse physical or psychological condition arising from the induction or performance of an abortion." *Id.* The second provision mandated annual inspection of abortion clinics. *Id.* § 16-21-2-2.6.

Planned Parenthood filed a preliminary injunction seeking to enjoin the implementation of the reporting requirement on the grounds that the definition of "abortion complication" was unconstitutionally vague: the definition included—without limitation—"*any* adverse physical or psychological condition arising from the induction or performance of an abortion." *Id.* § 16-34-2-4.7(a) (amended eff. July 1, 2019)

4

(emphasis added).  The court agreed and granted the injunction.  (Filing No. 30, Findings

of Fact and Conclusions of Law).

In response, the General Assembly enacted House Enrolled Act 1211 in 2019,

which amended the reporting requirement but left the inspection requirement

undisturbed.  The Complications Statute now reads:

> As used in this section, "abortion complication" means only
> the following physical or psychological conditions arising
> from the induction or performance of an abortion:
>
> (1)    Uterine perforation.
> (2)    Cervical laceration.
> (3)    Infection.
> (4)    Vaginal bleeding that qualifies as a Grade 2 or higher
>        adverse event according to the Common Terminology
>        Criteria for Adverse Events (CTCAE).
> (5)    Pulmonary embolism.
> (6)    Deep vein thrombosis.
> (7)    Failure to terminate the pregnancy.
> (8)    Incomplete abortion (retained tissue).
> (9)    Pelvic inflammatory disease.
> (10)   Missed ectopic pregnancy.
> (11)   Cardiac arrest.
> (12)   Respiratory arrest.
> (13)   Renal failure.
> (14)   Shock.
> (15)   Amniotic fluid embolism.
> (16)   Coma.
> (17)   Placenta previa in subsequent pregnancies.
> (18)   Pre-term delivery in subsequent pregnancies.
> (19)   Free fluid in the abdomen.
> (20)   Hemolytic reaction due to the administration of ABO-
>        incompatible blood or blood products.
> (21)   Hypoglycemia occurring while the patient is being
>        treated at the abortion facility.
> (22)   Allergic reaction to anesthesia or abortion inducing
>        drugs.
> (23)   Psychological complications, including depression,
>        suicidal ideation, anxiety, and sleeping disorders.

(24)   Death.
(25)   Any other adverse event as defined by criteria in the
       Food and Drug Administration Safety Information and
       Adverse Event Reporting Program.

Ind. Code. § 16-34-2-4.7(a).  The rest of the statute remained substantively unchanged.

The statute requires physicians, hospitals, and abortion clinics to report to the Indiana

State Department of Health each case in which the person or entity treated a woman

suffering from an abortion complication.  *Id.* § 16-34-2-4.7(b).  The complications must

be submitted every year to the Department on a form developed by the Department.  *Id.* §

16-34-2-4.7(c), (d).  Not later than June 30 of each year, the Department must summarize

the information collected from the previous year and submit the findings to the United

States Centers for Disease Control and Prevention for inclusion in its annual Vital

Statistics Report.  *Id.* § 16-34-2-4.7(g), (h).  Each failure to report an abortion

complication is a Class B misdemeanor.  *Id.* § 16-34-2-4.7(j).

The Inspection Statute directs the Department of Health to inspect abortion clinics

on an annual basis.  *Id.* § 16-21-2-2.6.  The Department may also conduct complaint

inspections as needed.  *Id.*  Prior to the enactment of Senate Enrolled Act 340, Indiana

law provided that the Department "*may* inspect an abortion clinic at least one (1) time per

calendar year and may conduct a complaint inspection as needed." *Id.* (amended eff. July

1, 2018) (emphasis added). The Inspection Statute's annual inspection requirement only

applies to abortion clinics.

## III.   Legal Standard

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The existence of some factual dispute will not defeat an otherwise properly supported motion for summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Id.*

## IV.   Planned Parenthood's Vagueness Challenge to the Complications Statute

Planned Parenthood argues the Complications Statute is unconstitutionally vague in two respects.  First, it asserts the phrase "arising from the induction or performance of an abortion" is vague and provides no meaningful guidance on when "complications" must be reported.  Second, Planned Parenthood identifies two specific enumerated complications as vague: "psychological complications" and "other adverse events." Planned Parenthood brings a facial vagueness challenge to the Complications Statute.  As a threshold matter, the court must consider whether Planned Parenthood is entitled to do so.

### A.   Facial Challenge to the Complications Statute

The Seventh Circuit has identified three categories of statutes for purposes of a vagueness challenge: (1) statutes that implicate activities protected by the First Amendment, *United States v. Cook*, 914 F.3d 545, 550 (7th Cir. 2019); (2) statutes that "simply ha[ve] no core and lack[] any ascertainable standard for inclusion and exclusion" (internal quotations omitted), *id.*; and (3) statutes that have a "readily appreciable core of

conduct that the statute reaches," but that leave "uncertainty as to whether the statute might apply to certain hypothetical facts," *id.* at 553-54.[3]  Plaintiffs challenging statutes that fall within the second category may bring a facial challenge, while statutes that fall within the third category are limited to as-applied challenges.  *Id.* at 550.

The court finds that the Complications Statute falls within the second category. The conduct intended to be covered by the statute is itself subject to uncertainty. Questions of causation are at the heart of Planned Parenthood's challenge to the statute, and the statute fails to establish clear standards for whether certain conduct falls within its ambit.

The State argues that the analysis in *Cook* should lead the court to a finding that the Complications Statute has a readily appreciable core of conduct, and the only question is how the statute may apply to specific facts.  In *Cook*, the Seventh Circuit considered a facial challenge to a federal statute that prohibited an unlawful user of a controlled substance from possessing a firearm.  *Id.* at 549.  The court held that Cook was not entitled to bring a facial challenge to the statute because there is a "readily appreciable core of conduct prohibited by the statute," *id.* at 551, and his conduct "undoubtedly falls within the obvious core of conduct proscribed by the statute," *id.* at 554-55.  But in making this determination, the court found guidance in case law as to what that "core of conduct" included.  The court looked to *United States v. Yancey*, 621 F.3d 681 (7th Cir. 2010), for additional "gloss on the statute" to evaluate Cook's

---

[3] The parties agree that Planned Parenthood is not challenging the statute under the First Amendment.

vagueness claim.  *Cook*, 914 F.3d at 551.  *Yancy* construed the term "unlawful user" to mean one who regularly or habitually ingests controlled substances in a manner other than as prescribed by a physician.  *Id.*  (citing *Yancy*, 621 F.3d at 682).  With that definition in mind, the *Cook* court could easily find that "there can be no doubt as to the core of conduct that the statute (as construed by *Yancey*) proscribes: the possession of a firearm by an individual engaged in the regular, non-prescribed use of a controlled substance."  914 F.3d at 551.

But the Complications Statute is not subject to the same construction.  Unlike the challenged statute in *Cook*, the language in the Complications Statute has not been previously interpreted to provide greater specificity.  The question of causation—whether a complication arose from an abortion—is at the heart of Planned Parenthood's challenge. Any time a patient presents with one or more of the enumerated "complications," a physician or other medical provider must determine, without any statutory standard, whether it arose from the abortion procedure.  This is not the narrowly defined core of conduct presented in *Cook*: if someone regularly uses marijuana or another controlled substance other than as directed by a physician, that person may not possess a firearm so long as the use persists.  Under the Complications Statute, physicians are left to guess whether the statute reaches their decision to report or not to report.  "Such a standardless statute poses a trap for the person acting in good faith, who is given no guidepost by which he can divine what sort of conduct is prohibited."  *Cook*, 914 F.3d at 550.  Because the statute has no core and lacks any ascertainable standard for inclusion and exclusion, Planned Parenthood may bring a facial challenge to the statute.

## B.    Vagueness Overview

"In our constitutional order, a vague law is no law at all."  *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).  "The void for vagueness doctrine rests on the basic due process principle that a law is unconstitutional if its prohibitions are not clearly defined."  *Hegwood v. City of Eau Claire*, 676 F.3d 600, 603 (7th Cir. 2012).  In *Grayned v. City of Rockford*, the Supreme Court explained the principles underlying the doctrine:

> Vague laws offend several important values. First, because we assume that man is free to steer between lawful and unlawful conduct, we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning.  Second, if arbitrary and discriminatory enforcement is to be prevented, laws must provide explicit standards for those who apply them. A vague law impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application.

408 U.S. 104, 108-09 (1972) (footnotes omitted).  But courts have cautioned that these principles should not be mechanically applied, as "the degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment."  *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498 (1982).

Courts are more tolerant of statutes with civil rather than criminal penalties because "the consequences of imprecision are qualitatively less severe."  *Id.* at 499; *see also Whatley v. Zatecky*, 833 F.3d 762, 777 (7th Cir. 2016) ("And so statutes involving business regulations or other civil matters need not be as precise as those which impose

10

criminal penalties or those that may infringe on constitutional rights.").  Penal statutes

must "define the criminal offense with sufficient definiteness that ordinary people can

understand what conduct is prohibited and in a manner that does not encourage arbitrary

and discriminatory enforcement."  *Kolender v. Lawson*, 461 U.S. 352, 357 (1983).  The

Seventh Circuit has also recognized that sanctions against an individual's license

implicate vagueness concerns.[4]  *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind.*

*State Dep't of Health*, 258 F. Supp. 3d 929, 949 (S.D. Ind. 2017) (citing *United States ex*

*rel. Fitzgerald v. Jordan*, 747 F.2d 1120, 1129-30 (7th Cir. 1984); *Baer v. City of*

*Wauwatosa*, 716 F.2d 1117, 1123-24 (7th Cir. 1983)).

## C.   The Phrase "arising from the induction or performance of an abortion" Is Unconstitutionally Vague

The Complications Statute defines "abortion complication" as "only the following

physical or psychological conditions *arising from* the induction or performance of an

abortion."  Ind. Code. § 16-34-2-4.7(a) (emphasis added).  Planned Parenthood contends

that this language is vague for two reasons.  First, the language is not clear as to the

extent to which a complication must be caused by the abortion itself.  Second, the statute

requires a degree of certainty as to causation that does not exist.

The court agrees.  The statute simply lacks any standard to guide physicians in

determining whether a condition qualifies as an abortion complication for purposes of

reporting.  The indeterminacy of the statute's requirements denies fair notice to

---

[4] The Indiana Medical Licensing Board has the authority to discipline any physician who "knowingly violated any state statute or rule, or federal statute or regulation, regulating the profession in question."  Ind. Code. § 25-1-9-4(a)(3).

physicians and invites arbitrary enforcement by prosecutors. *See Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018) ("The void-for-vagueness doctrine, as we have called it, guarantees that ordinary people have 'fair notice' of the conduct a statute proscribes. And the doctrine guards against arbitrary or discriminatory law enforcement by insisting that a statute provide standards to govern the actions of police officers, prosecutors, juries, and judges.") (citations omitted).

The language of the statute does not make clear whether the duty to report covers conditions exclusively caused by the abortion procedure, conditions that are only slightly caused or exacerbated by the abortion procedure, or something in between. The language also fails to indicate whether a complication must only be reported if the physician is 100 percent certain it was caused by the abortion, or if the obligation to report includes complications that the physician thinks are more likely than not attributable to the abortion procedure.

Consider a physician who treats a woman who previously obtained an abortion and is experiencing depression. Under the statute, the physician must decide whether the patient's depression arose from the abortion procedure. But the statute provides no guidance as to how the physician—who is not a licensed psychiatrist or clinical psychologist—must make that determination. It is not clear whether the physician must categorically rule out other possible causes of the depression before reporting, or if it is simply enough to say that the patient's depression could possibly be attributed to the abortion.

Alternatively, take the case of a woman who had an abortion and subsequently experiences a pre-term birth.  Under the statute, pre-term delivery in a subsequent pregnancy must be reported if it arose from an abortion procedure.  The litigants' experts disagree as to whether there is any causal connection between abortions and pre-term delivery in subsequent pregnancies.  (*Compare* Filing No. 16-5, Declaration of Sabrina Holmquist, ¶ 44 (stating studies regarding the effect of an abortion procedure on pre-term delivery in subsequent pregnancies are inconsistent; while some studies have found an association between second trimester abortion and subsequent pre-term delivery, causation has never been shown.  This association has not been shown for first trimester or medication abortion.), *with* Filing No. 24-1, Declaration of Christina Francis, ¶ 20 (stating a review of the literature shows that abortion often leads to complications with subsequent pregnancies, mainly pre-term delivery.)).  The State, through its experts, has made its position known.  But the statute fails to give the treating physician any guidance in determining when a pre-term delivery must be reported as an abortion complication.  As a result, physicians may feel obligated to report *any* pre-term delivery if the woman previously had an abortion, despite the dispute over whether there is any causal relationship at all.  These scenarios are particularly troubling given the potential criminal and professional implications of not reporting. The result, of course, is that physicians and other providers may overreport the enumerated complications, making abortion appear less safe than it really is.

Not to worry, the State says: we can avoid these concerns by simply reading a *mens rea* requirement into the statute.  *See State v. Keihn*, 542 N.E.2d 963, 967 (Ind.

13

1989) (finding a presumption in Indiana law that criminal statutes require proof of *mens rea*). According to the State, a condition must be reported as an abortion complication if, in the physician's reasonable medical judgment, it arose from the abortion procedure. For support, the State directs the court to the Seventh Circuit's decision in *Karlin v. Foust*, 188 F.3d 446 (7th Cir. 1999). In *Karlin*, the Seventh Circuit rejected a vagueness challenge to a Wisconsin law requiring physicians to exercise "reasonable medical judgment" to determine whether a medical emergency existed before performing an abortion. *Id.* at 468.[5] The court concluded that an objective standard in this context is not per se unconstitutionally vague; the "reasonable medical judgment" standard provides physicians fair warning as to what conduct is expected of them to avoid liability; and that the standard could adequately guide those responsible for enforcing the statute. *Id.*

The difficulty with the State's argument is that what the State asks the court to read into the statute is not a *mens rea* requirement, but rather a standard to govern the determination of whether a condition qualifies as an abortion complication.[6] That is something else entirely. Reasonable medical judgment is not a *mens rea* because its

---

[5] The statute defined a "medical emergency" as: "[A] condition, in a physician's reasonable medical judgment, that so complicates the medical condition of a pregnant woman as to necessitate the immediate abortion of her pregnancy to avert her death or for which a 24-hour delay in performance or inducement of an abortion will create serious risk of substantial and irreversible impairment of one or more of the woman's major bodily functions." Wis. Stat. § 253.10(2)(d).

[6] The court notes that the statute in fact lacks both a standard to guide the determination of what qualifies as an abortion complication under subsection (a) and a *mens rea* requirement to define the mental state required to commit the criminal act under subsection (j). Subsection (j) reads: "each failure to report an abortion complication as required under this section is a class B misdemeanor." Ind. Code § 16-34-2-4.7(j). It does not provide that the failure must have been done "knowingly" or "recklessly," for example.

14

inclusion in the statute would not demonstrate that an individual had the required mental state at the time of committing the statute's *actus reus*: failing to report an abortion complication.  If a true *mens rea* were read into the statute—such as "knowingly" or "recklessly"—it would not save the statute because it could not be read into subsection (a), which contains the challenged language.  Rather, it would be read into subsection (j), which contains the criminal act: failure to report an abortion complication.  But the statute is not unconstitutionally vague because subsection (j) lacks a *mens rea* requirement.  It is unconstitutionally vague because the statute fails to provide any standard to precisely define the contours of the underlying act—determining whether a complication arises from an abortion procedure—that ultimately leads to the prohibited activity: failing to report an abortion complication.

The court declines the State's invitation to read into the statute a standard that the General Assembly left out.  The presumption that criminal statutes require proof of *mens rea* does not mean the court can import a *standard* into the statute.  The State has not cited to a case where a court has read a reasonable medical judgment standard into a statute, and the court is unaware of such a case.  Instead, the State cites to a case where a statute included the reasonable medical judgment standard in the text and imposed only civil penalties for any violation.  But that is not this case, and the State's reliance on *Karlin* is inapposite.

First, the statute in *Karlin* contained an *explicit* standard; the Complications Statute contains *no* standard.  As the court in *Karlin* noted, "to avoid a finding of vagueness in the abortion context, a statute that imposes liability for violations of its

15

provisions must provide an explicit standard for those who enforce or apply the statutes provisions so as to prevent them from engaging in arbitrary and discriminatory enforcement."  188 F.3d at 465.  Planned Parenthood does not argue that a reasonable medical judgment standard—if included in the language of the statute—is itself unconstitutional.  Rather, the core of Planned Parenthood's argument is that the General Assembly failed to provide *any* standard in the statute.

Karlin is not on point for a second reason.  The statute at issue in that case involved civil penalties; it did not impose criminal liability.  Violations under that statute resulted in civil liability, a penalty constituting monetary forfeiture, and professional discipline.  *Id.* at 466.  Under the Complications Statute, each failure to report an abortion complication is a Class B misdemeanor.  While the Seventh Circuit in *Karlin* could find the Wisconsin statute sufficiently precise to survive a vagueness challenge, that statute included an explicit standard and imposed only civil penalties.  The Complications Statute lacks both features.

"Perhaps the most basic of due process's customary protections is the demand of fair notice."  *Dimaya*, 138 S. Ct. at 1225 (Gorsuch, J., concurring).  By suggesting the court read in a standard that appears nowhere in the statute, the State asks the court to disregard due process's requirement that criminal laws give ordinary people fair notice of the proscribed conduct.  *See Johnson v. United States*, 135 S. Ct. 2551, 2556 (2015); *Kolender*, 461 U.S. at 357-58.  When a physician looks at the text of the statute, how is she to know that a court has read in a requirement that she must use her reasonable medical judgment in determining whether a condition arises from an abortion?  She

might guess that that is the applicable standard.  But guesswork in the face of criminal liability is surely not permitted by due process, and the court will not place physicians and other practitioners in that position.

When the legislature passes a vague law, courts are not to step in and fashion a new, clearer law.  *United States v. Davis*, 139 S. Ct. 2319, 2323 (2019).  Instead, the court must "treat the law as a nullity and invite the [the legislature] to try again."  *Id.*  The phrase "arising from the induction or performance of an abortion" does not provide ordinary people with fair notice of what the law demands of them.  The statute provides no standard by which practitioners must guide their decision making, and it provides no standard to limit arbitrary prosecution.  Therefore, the court concludes that the phrase "arising from the induction or performance of an abortion" is unconstitutionally vague.  Because that phrase controls the statute, the court does not reach Planned Parenthood's second vagueness challenge to specific enumerated complications.

## V.    Planned Parenthood's Equal Protection Challenge to the Inspection Statute

The court now turns to Planned Parenthood's challenge to the constitutionality of the Inspection Statute on equal protection grounds.

"The Equal Protection Clause of the Fourteenth Amendment commands that no state shall 'deny to any person within its jurisdiction the equal protection of the laws,' which essentially is a direction that all persons similarly situated should be treated alike." *Vision Church v. Vill. of Long Grove*, 468 F.3d 975, 1000 (7th Cir. 2006) (citations omitted).  The Supreme Court "has long held that 'a classification neither involving fundamental rights nor proceeding along suspect lines . . . cannot run afoul of the Equal

Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Armour v. City of Indianapolis, Ind.*, 566 U.S. 673, 680 (2012) (quoting *Heller v. Doe*, 509 U.S. 302, 319-20 (1993).  While "equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices," *F.C.C. v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993), statutory classifications, even those subject to rational basis review, are not wholly outside judicial oversight.  *Baskin v. Bogan*, 766 F.3d 648, 654 (7th Cir. 2014).  Under rational basis review, "courts examine, and sometimes reject, the rationale offered by government for the challenged discrimination."  *Id.*

In this case, the Inspection Statute passes constitutional muster so long as the State can demonstrate a "rational relationship between the disparity of treatment and some legitimate governmental purpose."  *Heller*, 509 U.S. at 320.  The state legislature "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind."  *Williamson v. Lee Optical of Okla. Inc.*, 348 U.S 483, 489 (1955).  Indeed, "the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all."  *Dandridge v. Williams*, 397 U.S. 471, 486-87 (1970).   Because the State has offered at least a plausible explanation for the decision to subject abortion clinics to stricter inspection requirements, the court concludes the Inspection Statute does not violate equal protection.

According to the State, the annual inspection requirement furthers the State's compelling interest in protecting women's health and fetal life by ensuring abortion

18

clinics follow applicable health and safety regulations and informed consent requirements

Moreover, the State points to the experience with Dr. Ulrich Klopfer, a former Indiana

abortion provider who lost his abortion clinic and medical license for numerous

violations, as a specific reason for the General Assembly's decision to impose additional

inspection requirements.[7]   While the State acknowledges that Klopfer's violations were

discovered after a complaint was filed against him, the State argues that the violations

might have been discovered earlier if the clinic had been subject to annual inspections.

Matt Foster, the assistant commissioner for the Consumer Services and Health Care

Regulation Commission at the Department of Health, cited the experience with Dr.

Klopfer as motivation for the decision to increase the frequency of inspections: "we need

to get into these places more frequently, because we don't want, ever, to have another

Women's Pavilion on our hands." (Foster Dep. at 66-67).[8]

---

[7] Dr. Klopfer's facility, Women's Pavilion of South Bend, was not a Planned Parenthood-affiliated facility.  The clinic surrendered its license after the Department of Health conducted an inspection following a complaint. (Foster Dep. at 44). After an inspection of the facility in October 2014 yielded a "50- or 60-page report" outlining various violations, Dr. Klopfer failed to submit an acceptable plan of correction.  (*Id.* at 65).  The State denied his application for renewal of a license in June 2015. (*Id.* at 66).  The hearing on the denial was scheduled for November 2015, but Dr. Klopfer opted to voluntarily surrender his license. (*Id.*).

[8] The court notes the instances cited by Planned Parenthood of other licensed facilities facing similar licensing actions.  At least one ambulatory surgical center surrendered its license after an action to revoke its action was started.  (Foster Dep. at 54).  One or two revocation actions were also initiated against hospitals or surgical centers, though none resulted in the loss of a license. (Stipulation ¶ 1).  The actions were resolved through agreed orders which set out what the facilities must do to remedy the violations, and the Department of Health monitored the efforts of each facility and confirmed that the violations were resolved.  (*Id.*).  But, as noted *supra*, the legislature is not required to choose between addressing every aspect of a problem or not addressing the problem at all.  *Dandridge*, 397 U.S. at 486-87.  Unlike the situation with Dr. Klopfer, these facilities resolved their license disputes by complying with plans to address the violations.  The legislature here has offered a rational reason for addressing abortion clinics first.

Planned Parenthood resists this conclusion on the grounds that it is fundamentally irrational to subject abortion clinics to more stringent inspection requirements than other facilities that perform abortions, such as hospitals and ambulatory surgical centers.  If the State were really interested in protecting women's health and fetal life, then it is irrational to not hold all facilities that perform abortion to the same standard.  Planned Parenthood cites *Planned Parenthood of Ind. & Ky., Inc. v. Comm'r, Ind. State Dep't of Health*, 64 F. Supp. 3d 1235 (S.D. Ind. 2014) ("*PPINK I*") to support its claim that subjecting abortion clinics to more stringent inspection requirements than other health facilities violates equal protection.  In that case, the court invalidated on equal protection grounds a statute prohibiting waiver of physical plant requirements for abortion clinics, but not for hospitals and ambulatory surgical centers.  The court held that "the State has presented no rational basis for this unequal treatment" because hospitals and ambulatory surgical centers also performed abortions.  *Id.* at 1259-60.  The court reasoned that because the generally applicable waiver rule already prohibited granting a waiver that would adversely affect the health and safety of patients, the abortion clinic waiver provision could not be justified on health grounds.  *Id.* at 1259.  The court also rejected the State's argument that the legislature may require abortion clinics to be minimally prepared to treat abortion complications surgically because the waiver provision did not apply to all medical facilities that performed abortions.  *Id.*  Hospitals and ambulatory surgical centers were free to obtain a waiver, even though they also performed abortions.  *Id.* at 1259-60.

This case presents a different set of facts than those at issue in *PPINK I*. Abortion clinics, hospitals, and ambulatory surgical centers were not differently situated for purposes of the State's proffered rationales in *PPINK I*—the woman's health and safety and minimum surgical capability requirements. Here, by contrast, the State has pointed to a critical difference between abortion clinics and hospitals and ambulatory surgical centers, and it is that difference on which the State justifies its differing treatment. Hospitals and ambulatory surgical centers may join an accrediting agency which will complete the federally required inspections. Under state law, the State must issue a license to any of these member entities that pass the inspection, even though these facilities may perform abortions. Ind. Code § 16-21-2-13(b)(2). There is no similar arrangement for abortion clinics. If abortion clinics are to be inspected—and they must be—that responsibility falls to the State. Because the State has offered a rational reason for the decision to subject abortion clinics to stricter inspection requirements, the court concludes the Inspection Statute does not violate equal protection.

## VI.   Conclusion

For the reasons set forth herein, the court **GRANTS in part** and **DENIES in part** Planned Parenthood's Motion for Summary Judgment (Filing No. 73). The court grants its motion on its claim that Indiana Code § 16-34-2-4.7 is unconstitutionally vague. The court **DENIES** Planned Parenthood's request for summary judgment on its claim that Indiana Code § 16-21-2-2.6 violates equal protection. The court **GRANTS in part** and **DENIES in part** the State's Motion for Summary Judgment (Filing No. 77). The court **GRANTS** the State's motion on its claim that Indiana Code § 16-21-2-2.6 does not

violate equal protection.  The court **DENIES** the State's request for summary judgment

on its claim that Indiana Code § 16-34-2-4.7 is not unconstitutionally vague.

**SO ORDERED** this 8th day of July 2020.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.